**Pages 1 - 37**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

WAYNE HAYES, individually and  )
on behalf of all others        )
similarly situated,            )
                               )
          Plaintiff,           )
                               )
  VS.                          )      **NO. 24-CV-04249-JD**
                               )
ENPHASE ENERGY, INC., ET AL.,  )
                               )
          Defendants.          )
_____)

                              San Francisco, California
                              Thursday, September 5, 2024

                    TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiffs:
                    THE BURKE LAW FIRM
                    1001 Wilshire Boulevard, Suite 2187
                    Los Angeles, CA 90017
               BY:  **TIMOTHY J. BURKE, ATTORNEY AT LAW**

                    BERNSTEIN LIEBHARD LLP
                    10 East 40th Street
                    New York, NY 10016
               BY:  **LAURENCE J. HASSON**

                    GLANCY PRONGAY AND MURRAY LLP
                    1925 Century Park East, Suite 2100
                    Los Angeles, CA 90067
               BY:  **CHARLES H. LINEHAN, ATTORNEY AT LAW**

         **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**


REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       U.S. District Court - Official Reporter

                        THE ROSEN LAW FIRM, P.A.
                        275 Madison Avenue, 400th Floor
                        New York, New York  10016
            BY:  **DANIEL TYRE-KARP, ATTORNEY AT LAW**

For Defendants:

                        LATHAM AND WATKINS LLP
                        140 Scott Drive
                        Menlo Park, CA 94025
            BY:  **DANIEL R. GHERARDI, ATTORNEY AT LAW**

<u>Thursday - September 5, 2024</u>                           <u>10:06 a.m.</u>

P R O C E E D I N G S

---o0o---

THE COURT:  Good morning.

That was tepid.  Good morning.

**All:**  Good morning.

THE COURT:  That's what you do in federal court.

THE COURTROOM DEPUTY:  Please be seated or you can come forward.

Calling Civil 24-4249, Hayes v. Enphase Energy, Inc., et al.

Plaintiff, as always, closest to the jury.  And you'll need to stand and state your appearances at the podium.

MR. LINEHAN:  Charles Linehan from Glancy Prongay & Murray on behalf of lead plaintiff movant --

THE COURT:  Which plaintiff?

MR. LINEHAN:  I'm sorry?

THE COURT:  Which plaintiff?

MR. LINEHAN:  Lead plaintiff movant, Lon Praytor.

THE COURT:  All right.

You're Mr. Praytor; is that right?

MR. LINEHAN:  That's correct.

THE COURT:  Okay.  Okay.

MR. HASSON:  Morning, Your Honor.  Laurence Hasson, from Bernstein Liebhard, representing lead plaintiff movant,

Andrey Ponomarchuk.

**THE COURT:**  Oh, Mr. Ponomarchuk.  Okay.  All right.

**MR. BURKE:**  Morning, Your Honor.  Timothy Burke, proposed liaison counsel, from the law office -- from The Burke Law Firm -- for Mr. Ponomarchuk, also.

**THE COURT:**  Oh, okay.

**MR. TYRE-KARP:**  Good morning, Your Honor.  Daniel Tyre-Karp, from The Rosen Law Firm, representing lead plaintiff movant, Daniel Smith.

**THE COURT:**  Smith -- all right.  Is he the doctor in Honolulu?

**MR. TYRE-KARP:**  He is -- retired.

**THE COURT:**  Okay.

**MR. GHERARDI:**  Morning, Your Honor.  Daniel Gherardi of Latham and Watkins on behalf of defendants.

**THE COURT:**  All right.  You can just enjoy the day.

All right.  Is it Linehan or Linehan?

**MR. LINEHAN:**  Linehan.

**THE COURT:**  Linehan.  Okay.  We've got a remote reporter, so you have to -- she's live, but offsite -- you have to stay at the podium.

So let me ask you a question:  How many securities cases have you tried?

**MR. LINEHAN:**  Me, personally, or my firm?

**THE COURT:**  You.

MR. LINEHAN:  I've not tried any securities cases.

THE COURT:  Zero?

MR. LINEHAN:  Zero.

THE COURT:  And how long have you practiced?

MR. LINEHAN:  I'm at about ten years now.

THE COURT:  Okay.

All right.  Mr. Hasson, how many securities cases have you tried?

MR. HASSON:  Likewise, I've also tried no cases.  It's very rare for these cases to go to trial.

THE COURT:  You've tried no -- you have not tried any securities classes -- class-action cases; is that right?

MR. HASSON:  That's correct, Your Honor.

THE COURT:  Okay.

All right.  Tyre-Karp -- Mr. Tyre -- is that -- if I'm -- if I get your name wrong, just tell me.  Mr. Tyre-Karp, how many securities cases have you tried?

MR. TYRE-KARP:  Your Honor, Daniel Tyre-Karp.  I've tried zero securities cases.

THE COURT:  All right.  Well, here's the deal.  I don't appoint firms.  So I'm going to appoint one of you.  You're the lead counsel.  I'm concerned that none of you have tried a case -- securities case.  It's not good.

This is a Rule 23 or a JPML case --

MR. TYRE-KARP:  Your Honor --

**THE COURT:** A big strike against you. Under the PSLRA, I have less leeway, because the plaintiffs kind of get to call the shots on the counsel. But that doesn't tie my hands completely.

All right. Here's what I'm thinking. It looks to me like Mr. Praytor is in the lead in terms of most to gain. That's the way to look at the case. Okay? That's what you look for. Which plaintiff has the most to gain? That's the flip side of the biggest loss. In other words, the reason I emphasize "most to gain" is because that's the plaintiff who's going to supposedly have the biggest fire under his or her feet to make things happen.

So it looks to me like, under the LIFO method, which I intend to use, Mr. Praytor is the right person. That's my tentative. So if anybody wants to challenge that, this would be the time.

**MR. TYRE-KARP:** Your Honor, this is Daniel Tyre-Karp, from The Rosen Law Firm, for --

**THE COURT:** Yes.

**MR. TYRE-KARP:** -- Daniel Smith.

We do not believe that Mr. Praytor has the -- the largest financial interests in this case. We believe that Mr. Praytor's application to be lead plaintiff ignored the Supreme Court's ruling in *Dura*, which --

**THE COURT:** I'm not really -- I'm not inclined to

apply *Dura*.  But I believe the Praytor people said that if it was applied to Mr. Smith, you'd come out even lower.  So if you're going to apply it to him, you got to apply it to your own client too.

Now, do you dispute the application that your colleague applied to *Dura* for Mr. Smith?

MR. TYRE-KARP:  I believe that if you look at -- in a case like this, where there's a single corrective disclosure, it means that everyone who held stock at the time of the corrective disclosure lost -- they suffered damages caused by the truth entering the market and the fraud-induced inflation of the stock price being removed.  So when you look at how much people have to gain from this lawsuit, we look at how much they stood to -- how much --

THE COURT:  That wasn't my question.  My question was -- you want to apply *Dura* to Mr. Praytor.

MR. TYRE-KARP:  Yes, Your Honor.

THE COURT:  Okay.  Did you apply it to your own client?

MR. TYRE-KARP:  Yes, Your Honor.  My client bought shares on one day and held them through the 90-day lookback.

THE COURT:  All right.

MR. TYRE-KARP:  And his --

THE COURT:  But your colleague here said that if you apply *Dura* to your client, Mr. Smith, he drops down to

something like $96,000.

**MR. TYRE-KARP:**  I believe that's the other lead plaintiff, Ponomarchuk.

**THE COURT:**  All right.  Well, how much do you -- how much do you get down to?

**MR. TYRE-KARP:**  We're at about 144,000, I believe.

**THE COURT:**  All right.  And remind me where that compares to Mr. Praytor for that.

**MR. TYRE-KARP:**  We believe Mr. Praytor is just below that.  Our client held more shares at the time of the corrective disclosure than Mr. Praytor did, which means that he suffered more of a loss on the day of the corrective disclosure than Mr. Praytor.

**THE COURT:**  All right.

**MR. TYRE-KARP:**  We believe that the net shares or shares retained method is the proper method in this case --

**THE COURT:**  No, I'm not going to do that.  I'm not -- I'm actually not really inclined to apply *Dura* in this fashion. So, separate and apart from that, do you have any other objections to Praytor -- Mr. Praytor?

**MR. TYRE-KARP:**  We believe that beyond the largest financial loss issue, there are also typicality and adequacy concerns.

**THE COURT:**  Look, I know he was a day trader.  I know he did some short selling.  But so what?  He has the same --

what do you know that suggests that he has a unique defense against him with respect to reliance or anything else?

**MR. TYRE-KARP:**  Well, we know that he was betting against the company throughout the class period, including a week before the disclosure --

**THE COURT:**  What does that mean?  He was short selling?

**MR. TYRE-KARP:**  He was short selling.

**THE COURT:**  There were, like, a handful of transactions, according to Mr. Praytor's records.

**MR. TYRE-KARP:**  A handful of short-selling transactions, Your Honor?

**THE COURT:**  Yes.  He had a chart.  And they were a minority of his -- of his trades.

**MR. TYRE-KARP:**  They are a minority of the hundreds of trades that he made, Your Honor.  I believe he had 18 different short sales --

**THE COURT:**  Okay.  That's not much.

**MR. TYRE-KARP:**  -- including a week before the corrective disclosure.  But the larger issue is that the vast majority of his -- his purchases and sales occurred before the corrective disclosure.  And *Dura* is very clear, and as Your Honor recognized in the Zoom action, that you can't recover for normal market fluctuations.  The point of the security clause is to only recover for fraud.  And if you bought a stock, and

it went down, and it's not related to the fraud, that's not a damage that you can recover.  And it's not a financial interest in this litigation, because this litigation is only focused on recovering damages on behalf of investors due to the fraud.

THE COURT:  All right.

Mr. Linehan?

MR. LINEHAN:  Charles Linehan.

I think Your Honor's analysis is correct.  And as you pointed out, even applying *Dura*, my client has the largest loss of any movant.

THE COURT:  Well, you need to respond to what your colleague here just said.  It's not worth the time of day, because all of his trades were day trades.  He shorted the stock.  And he sold and bought things way before the disclosure date, so he benefited from the fraud.  What about all that?

MR. LINEHAN:  I wouldn't say he benefited from the fraud.  Because even -- taking those into consideration, applying -- even applying *Dura* -- he still has the largest loss.

I don't know if I should go over, you know, what was said in the brief.  But the issue with day trading and short selling is that these are all done at the market price.  Any --

THE COURT:  That's not the question.  Your colleague said he did all -- most of his trades before the corrective date, so it can't be -- he's not a good rep, for obvious

reasons.  So is that true or --

MR. LINEHAN:  Engaging -- no, that's not true. Engaging in most of your trades before the dates is --

THE COURT:  You gave me a chart.  I mean, are you -- you said it's not true, but it's right there on the chart. So --

MR. LINEHAN:  No, he -- you're right, Your Honor.  He did engage in most of his trades prior to the corrective disclosure.  But engaging in most of your trades prior to the corrective disclosure, as you pointed out, is not disqualifying.  He --

THE COURT:  I didn't say that.  I said it's not disqualifying to be a day trader.  I didn't -- I didn't say anything about buying and selling before the corrective date. I want to hear what you think about.  Why is that not disqualifying, and what case supports that?

MR. LINEHAN:  So I don't have a specific citation in front of me here, but buying -- in general, buying and selling before a corrective date -- which many, many investors have done and been appointed as lead plaintiff -- I can get you more cases on that specific point.  But --

THE COURT:  You've had your shot.  You just tell me now and that's it.

MR. LINEHAN:  Many courts have found that's not disqualifying to buy and sell before the corrective date --

**THE COURT:**  Well, why not?  What's the theory?  I'm not asking just to give me a Westlaw digest.  Why -- why is that not disqualifying?

**MR. LINEHAN:**  It's not disqualifying because -- so if you want to apply *Dura* to this, so long as he purchased before the corrective closure -- held those shares through the corrective disclosure --

**THE COURT:**  But he didn't.  That's what your colleague is saying, is that he bought them and sold them, because he's a day trader.  So he's making -- I don't know -- one, five, twenty day trades a day.  Buy in the afternoon; sell the next morning.  And that all happened -- buy-sell transactions -- beginning and end -- alpha to omega -- all happened before the corrective date.  So why is that not disqualifying?

**MR. LINEHAN:**  He -- if there are cases which say that if a movant buys and sells all of their shares before any corrective disclosure, and doesn't hold shares over corrective disclosure, that would be disqualifying.  But that's not the case here.  He purchased shares prior to the corrective disclosure in the lead-up to the --

**THE COURT:**  How can I -- how can I tell that from the chart?  Help me --

**MR. LINEHAN:**  So this --

**THE COURT:**  Where will I see evidence of that in the chart?  That he actually bought some shares and held them past

the corrective date?

**MR. LINEHAN:**  This is in Exhibit C to Mr. Praytor's initial motion, which is --

**THE COURT:**  Do you have a docket number there?

**MR. LINEHAN:**  I'll have it in one moment.  Docket Number 50 -- or, sorry -- Docket Number 25-3.

**THE COURT:**  Okay.

**MR. LINEHAN:**  And --

**THE COURT:**  Dash three -- all right.  What about -- what about dash two?  No?  Dash three -- all right.

**MR. LINEHAN:**  Dash two also has that, but dash three --

**THE COURT:**  Okay.  Give me an example here on this chart where he bought something and held it past the corrective -- bought before the corrective date and held it past, after.

**MR. LINEHAN:**  Sure.  That's on 50 -- sorry -- 25-3, page 8.

**THE COURT:**  Page 8?  Okay.

**MR. LINEHAN:**  Page 8 of that -- 50 -- of 25-3.

**THE COURT:**  All right.  Page 8.  Yes.

**MR. LINEHAN:**  And it's actually on page 7 --

**THE COURT:**  Oh, shares retained.

**MR. LINEHAN:**  -- as well.

**THE COURT:**  Okay.  Go ahead.  Yep.

**MR. LINEHAN:** So on page 7, as well. But I can -- I just show -- on page 8, there's shares retained at the very end of that --

**THE COURT:** Yes.

**MR. LINEHAN:** -- which shows 1,800. Now, that -- that number is shares that were purchased during the class period --

**THE COURT:** Before the corrective date.

**MR. LINEHAN:** Before the corrective date and, as of the date of putting this chart together, had not been sold.

**THE COURT:** Oh, so way past the corrective date.

**MR. LINEHAN:** So he's held it past. And there are other sales listed here on page 8. You'll see --

**THE COURT:** Before we do that, though -- so he-- so -- all right. So he had 1,800 shares all the way through, before and after corrective date, out of how many shares that he bought?

**MR. LINEHAN:** That would be on the gross shares purchase figure, which I believe we list in our opposition. I can have a citation to that in just a moment.

**THE COURT:** That's fine. Take your time.

**MR. LINEHAN:** It can be deduced from that chart, but it's also available at Docket Number 49, page 5. The total number of shares he purchased during the class period would be that gross shares purchase figure, which is 68,246. The --

**THE COURT:** What do -- what does net shares mean, by

the way?

**MR. LINEHAN:**  Net shares are the amount of shares he purchased during the class period and held through the corrective disclosure.

**THE COURT:**  And held through the corrective disclosure?

**MR. LINEHAN:**  Yes.  So he held 3,290 shares through the alleged corrective disclosure.

**THE COURT:**  Why is that different, though, from the 1,800 in the -- Docket 25?

**MR. LINEHAN:**  The 1,800 figure is the figure that he was holding as of the date we put the chart together.

**THE COURT:**  Oh, I see.

**MR. LINEHAN:**  If you look, he has some post-class period sales, which we accounted for in that chart, which losses on those would be recoverable.

**THE COURT:**  All right.  So he had -- let's call it 3,300 shares through the whole period.

**MR. LINEHAN:**  Which he held though -- that he bought during the period and held through the corrective disclosure.

**THE COURT:**  Okay.

All right.  Well, Mr. Tyre-Karp, what's wrong with that?  Doesn't that answer your concern?

**MR. TYRE-KARP:**  Your Honor, if you look at the -- this is Daniel Tyre-Karp from The Rosen Law Firm.

If you look at the chart that my colleague just pointed you to --

THE COURT:  Yes.

MR. TYRE-KARP:  -- it shows that Mr. Smith actually had the most net shares.  That Mr. Smith held the most shares at the time -- the most net shares -- at the time of the corrective disclosure.

THE COURT:  No, no, that's not my point.  My point is you were -- you were saying, earlier, Mr. Praytor should be kicked out because he didn't hold enough shares purchased during the class period and after the corrective date.  In fact, he held just 60 fewer shares than your client, but at a much higher LIFO loss.  So doesn't that address all your complaints?

MR. TYRE-KARP:  No, Your Honor.  The LIFO loss is due to the purchases and sales prior to the corrective disclosure.  If you look just at who held the shares at the time of the corrective disclosure, our client had the largest loss because he held the most shares.  And when the inflation was removed from the stock price, the person who held the most shares suffered the greatest loss.

In addition, Mr. Praytor sold a number of his shares in the five days following the corrective disclosure at a price that is higher than the 90-day lookback price.  So the loss for Mr. Smith's shares are calculated based on the 90-day lookback

price, because he retained all of his shares through the 90-day lookback period.  Whereas Mr. Praytor sold a large chunk of his shares in the five days following, when the stock price was still higher.  So his loss per share is lower and his total number of shares is lower than Mr. Smith.

THE COURT:  Okay.

All right.  Any closing thoughts, Mr. Linehan?

MR. LINEHAN:  Yes, Your Honor.

With respect to the -- if you want to look at just the shares that were held through that corrective disclosure and what are the losses on those shares, that is actually the *Dura* analysis.  And, under that *Dura* analysis, Mr. Praytor still has the largest loss.  So if you want to take out --

THE COURT:  Where is that in the brief?  Did you put that in one of your briefs?

MR. LINEHAN:  So that -- that chart was actually provided by Mr. Ponomarchuk, which is on -- well, Mr. Ponomarchuk did the *Dura* loss calculation for Mr. Praytor, because Mr. Ponomarchuk was arguing that that should be the figure used.  So that figure is presented in our reply brief.  It's also presented in --

THE COURT:  But, no, that's docket number what?

MR. LINEHAN:  I think the best docket number for that would be --

THE COURT:  53?  5-3?

**MR. LINEHAN:** One moment, Your Honor.

**THE COURT:** I think it's page -- it's Docket 53 at page 4; isn't it?

**MR. LINEHAN:** It is Docket Number 53, page -- yes, that's right. So it is Docket Number 53, page 4. That figure, which was provided by Mr. Ponomarchuk in his opposition, was 1,700 -- sorry -- $176,000, which would be that *Dura* adjusted loss for Mr. Praytor, only considering shares he held at the time of the corrective disclosure, which is still larger than any other movant if *Dura* is applied.

**THE COURT:** And that's still larger than what we just looked at; right?

**MR. LINEHAN:** Yes, which I believe is --

**THE COURT:** Remind me where that -- where was that chart that we just looked at? The one with the pre-adjusted loss.

**MR. LINEHAN:** The pre-adjusted loss was in --

**THE COURT:** The one you did, originally.

**MR. LINEHAN:** That was in Mr. -- or my client's opposition memorandum, which is --

**THE COURT:** Oh, 53. They're both in 53.

**MR. LINEHAN:** Yes. I believe it's also -- also provided in our opposition brief, as well.

**THE COURT:** Okay. So on page 1 -- or where, in your

opposition brief, is that?

Oh, there it is.  Okay.  It's Docket Number 49?

**MR. LINEHAN:**  Docket Number 49, page 5.

**THE COURT:**  All right.  So even if you applied *Dura* just to Mr. Praytor, that gets discounted down to 176,000.  And if you give Mr. Smith a huge break -- Dr. Smith -- a huge break, and don't even apply it to him, he's -- Mr. Praytor's loss is still larger than Dr. Smith's loss.

**MR. LINEHAN:**  That's correct.  Under *Dura*, Mr. Smith's loss would be the same as the LIFO loss presented here, because he didn't sell any shares, which is $143,000, approximately.

**THE COURT:**  Okay.  That seems to be right.  So, in a minute -- any last thought then, Mr. Tyre-Karp?

**MR. TYRE-KARP:**  Mr. Tyre-Karp for the plaintiff's side.

The chart that my counsel -- my -- counsel was just citing is from a different plaintiff that wasn't calculated by him.  And I'm not sure he knows how it was calculated --

**THE COURT:**  This issue is, are the numbers right?

**MR. TYRE-KARP:**  So the numbers are that Mr. Smith held the most shares during the corrective disclosure.  And Mr. Smith --

**THE COURT:**  I'm not worried about net shares.  I'm worried about --

**MR. TYRE-KARP:**  Mr. Smith lost the most per share --

**THE COURT:** But he hasn't though.

**MR. TYRE-KARP:** -- as a result of the --

**THE COURT:** We just --

**MR. TYRE-KARP:** -- corrective disclosure.

**THE COURT:** We just -- the total loss --

**MR. TYRE-KARP:** So this -- this --

**THE COURT:** Hold on.  The Judge finishes first.

**MR. TYRE-KARP:** I apologize.

**THE COURT:** Okay?  You need to stop when I start.  I got to lot to do.  And there are not a lot of people here today, but I got things to do.

Your client -- I mean, your colleague here has just persuasively demonstrated that even if *Dura* is applied in a one-party fashion just to Mr. Praytor, he still comes out on top of your client who doesn't have *Dura* applied to him.  So what's wrong with that?

**MR. TYRE-KARP:** Well, first of all, Your Honor, we're happy to apply *Dura* to our client.  Our client held, throughout the class period, there's no -- there's no difference in his -- his losses, whether you apply *Dura* or not.

I think that the key point here is that this is a case with a single corrective disclosure.  So it's presumed that there was a constant inflation of the stock price caused by the fraud throughout this -- the class period.

So if someone brought -- bought the stock at $200 versus

$150, as long as it was during the class period --

THE COURT:  Here's my question:  Right now, taking all of your arguments, just for discussion, against Mr. Praytor, he has $176,000 in loss.  Your client has 143.  How do you get over that?

MR. TYRE-KARP:  That the -- the only reason that he has a higher loss is because he purchased at a different time during the class period when the stock price was higher.  So it looks, at the naked eye, that he lost more money when the corrective disclosure came out.

THE COURT:  So what?

MR. TYRE-KARP:  But when you look at --

THE COURT:  When you have the same reliance on the misrepresentations as your client did, they're the same that way.  What difference does it make?

MR. TYRE-KARP:  When you look at recoverable damages, you look at the inflation of the stock price and what happens once it's removed.  And because this is a single corrective disclosure case, it's presumed that the stock price -- the inflation of the stock price -- was constant throughout the period.  So whether you bought the stock price at $250 or $200, all that matters is that it was inflated by the same amount so that each share was damaged by the same amount.  So --

THE COURT:  Okay.  Then an uninflated number for Mr. Praytor?

**MR. TYRE-KARP:**  I believe it's around 130,000.

**THE COURT:**  Where --

**MR. TYRE-KARP:**  He had fewer shares --

**THE COURT:**  Where is that in the docket?

**MR. TYRE-KARP:**  It's not in the docket, Your Honor. But I can tell you --

**THE COURT:**  No, no.  If it's not in the docket, I'm not going to look at it.  That was your chance to put it in. So you need to give me a docket cite.  I'm not doing calculations on the fly.

**MR. TYRE-KARP:**  Yes, Your Honor.  If you look at 25-3, which is the financial interest analysis filed by Mr. Praytor...

**THE COURT:**  Okay.

**MR. TYRE-KARP:**  It shows that -- if you look at the -- that last page of that.

**THE COURT:**  Yes.

**MR. TYRE-KARP:**  It shows that he sold a number of shares on April 26th and April 28th.  The class period ends on April 25th.  So in the -- the three days following the class period.  And you can see the price for those shares are mostly around $178.

**THE COURT:**  All right.

**MR. TYRE-KARP:**  The fact is that Mr. Praytor sold a large percentage of his retained shares in those few days right

after the class period ended.  And the 90-day lookback price is $169.  So Mr. --

THE COURT:  You didn't -- you didn't do all this math anywhere in the briefs; did you?

MR. TYRE-KARP:  The math is not in the briefs.  It's just --

THE COURT:  Okay.

MR. TYRE-KARP:  -- apparent on the spreadsheet, Your Honor.

THE COURT:  All right.

Okay.  Let's hear from the third person, Mr. Ponomarchuk.

MR. HASSON:  Thank you, Your Honor.  Laurence Hasson representing lead plaintiff movant, Ponomarchuk.

So, Your Honor, I think that there is some great confusion here surrounding the application of *Dura*.  First, let me just say that Mr. Ponomarchuk reported his loss and the initial motions under FIFO, LIFO, and *Dura*.  And the application of *Dura* to these cases is really not a controversial thing.  It's basically universally accepted.

Under a *Dura* analysis --

THE COURT:  It's not a matter of controversy.  I can do whatever I want, as long as it's rational and consistent.

MR. HASSON:  Sure.  Of course --

THE COURT:  I'm not really inclined to do *Dura*.  But, in any event, just go ahead.

**MR. HASSON:**  Well -- okay.  Well, under a *Dura* calculation, Your Honor, our loss is 282,000, which is more than the $176,000 *Dura* loss of Mr. Praytor.

The way you calculate LIFO and *Dura*, it's a matching accounting methodology.  And you have to match within the class period -- class period purchases to class period sales -- okay?  So sales that are during the class period that can't be matched to a class period purchase have to be ignored.  That's how *Dura* is applied.  You know, we cited the *CytoDyn* case as an example.

**THE COURT:**  I understand that.  What's the punch line?

**MR. HASSON:**  The upshot is that, under a *Dura* analysis, my client's loss doesn't change at all.  It's 282,000 versus 176,000.

**THE COURT:**  Okay.

Mr. Linehan?

**MR. LINEHAN:**  Charles Linehan.

Mr. Ponomarchuk's counsel is selectively applying *Dura* to my client but not theirs.

**THE COURT:**  He just -- he insists that he did that already.  He did every possible permutation.

**MR. LINEHAN:**  What they leave out is that they had many shares -- 300 -- or 3,000-some-odd shares -- that were purchased prior to the class period, which were sold during the class period.  If we're going to look at *Dura* to limit losses, under *Dura*, there would be substantial gains on those.  They

don't provide the figures for those losses, so we can't determine exactly what it is by just on a "back of the napkin" calculation.  If you were to apply *Dura* to them as well as us, their loss would still be much smaller --

THE COURT:  96,000; right?  Isn't that what you came up with?

MR. LINEHAN:  Sorry?

THE COURT:  You came up with about 96,000; right?

MR. LINEHAN:  Yes.  With -- if we had the exact figures from them -- you know --

THE COURT:  No, I understand.  It's a 96 with an asterisk.

MR. LINEHAN:  Yes, that's correct.

THE COURT:  Yeah.

Okay.  Final thoughts, Mr. Burke?  Or --

MR. HASSON:  Yes, Your Honor.

So, first of all, the reason that we didn't provide pre-class period purchase information is because it's irrelevant to these accounting methodologies, which only look within the class period.  But, that being said, we do know the pre-class period cost basis, and the outcome actually does not change.

If you factor in the pre-class period cost basis of the shares he purchased -- so you're ignoring the class period altogether, and you're looking at his pre-class period

purchases -- all that would do would be to reduce his loss by $35,000.  He would still have $247,000 versus Mr. Praytor's $176,000.

I'm happy to submit that information --

**THE COURT:**  You had your chance.  It's too late not.

**MR. HASSON:**  But, Your Honor, it's not relevant to -- these accounting methodologies are not something that I've made up.  This is how they're applied.

**THE COURT:**  I understand.  But I'm -- you had your shot.  I'm not taking any more briefing on it or argument -- or evidence on this.

**MR. HASSON:**  Okay.  So then, in that case, I would just say that it's just a fundamentally wrong argument.  He's misapplying *Dura*.  And, under *Dura* -- actual *Dura* -- our loss is 282,000 versus the 176,000.

**THE COURT:**  All right.  I haven't heard much about typicality and adequacy for Mr. Praytor.  Anybody want to add anything on that?

**MR. HASSON:**  Oh, for --

**THE COURT:**  Praytor -- for Mr. Praytor.

**MR. HASSON:**  (Indiscernible.  Not visible on camera or near a microphone.)

**THE COURT:**  No, no, no.  Any objections on typicality and adequacy grounds?  I know he was a day trader.  I don't find that to be disabling.

**MR. HASSON:**  Yeah.  I think --

**THE COURT:**  I know he short sold a couple times.  I don't find that to be disabling.  Is there anything else on typicality and other Rule 23(a) factors?

**MR. HASSON:**  I mean, those are inherent issues that raise reliance problems and unique defenses --

**THE COURT:**  What is it?  What's the reliance problem?  What evidence do you have -- look, here's a reliance problem:  A day trader uses an algorithm that has nothing to do with statements by the corporation.  That might be a problem.  There's no evidence of that here.

**MR. HASSON:**  Well --

**THE COURT:**  Day traders buy and sell for all sorts of reasons, and there's no evidence that Mr. Praytor is subject to any unique defenses.  I haven't seen any evidence.

**MR. HASSON:**  But this is a point that the *Hurst v. Enphase* case brought out, which is, you know, when there is a single disclosure -- right? -- and there's a high frequency trading, you know, prior to that disclosure, you know, there is a big concern that the trader is --

**THE COURT:**  I don't share that concern.  I don't see how a day trader is any differently situated from your client.  They both want to make money based on the honest price of the stock.  How are they different?  How is there anything unique about Mr. Praytor that would not be something your own client

would be subject to?

MR. HASSON:  Well, okay, so, Your Honor, Mr. Praytor, you know, bought and sold 95 percent of his shares prior to the corrective disclosure.  In my client's case, if you want to juxtapose the two, the only thing he sold was 3,635 pre-class period purchases.  He bought 5,644 shares during the class period and held all of those shares through the end of the class period.  So, you know, that is already, you know, a pretty significant difference.  So -- and also --

THE COURT:  But -- a difference.  But why is that a material difference that makes any difference?

MR. HASSON:  I think the material difference, Your Honor, is --

THE COURT:  In terms of Rule 23(a).

MR. HASSON:  Well, in terms of --

THE COURT:  I don't see how that makes any difference for Mr. Praytor being class representative.  Tell me how you think it does.

MR. HASSON:  I think there's an abundance of evidence that he's been -- his trading methodologies were not tethered to the statements made by the --

THE COURT:  Zero.  There is zero evidence.  You don't have a shred of evidence of what -- how Mr. Praytor made his trading decisions; do you?  Not a shred.

MR. HASSON:  I don't.  But the -- the high frequency

of them and the fact that 95 percent of his trades happened prior to the corrective disclosure -- and they're extensive trading.  It's not -- you know -- in my client's case, you have, you know, a handful of trades versus really pages and pages of trades.

THE COURT:  I understand that they are very differently situated in how they run their investments.  The question is, why does that make a difference under Rule 23(a)?  I haven't heard anything telling me why that makes a difference.

MR. HASSON:  Your Honor, if you're -- I mean, if you're not convinced, there are plenty of cases that have --

THE COURT:  Don't go worrying about what I'm convinced of.  I'm asking you -- this is your last shot.  Tell me why, in your own words, this makes a difference under Rule 23(a).

MR. HASSON:  Because reliance is a fundamental issue of securities cases.

THE COURT:  Absolutely.  We are in complete agreement.  Why does that --

MR. HASSON:  And so --

THE COURT:  Why does this make a difference in the reliance point?

MR. HASSON:  So it's not necessary to ultimately prove, with 100 percent certainty, at this point in time, that, you know, how or for what reason he traded under.  But the

Court, right now, is --

**THE COURT:**  I'm not asking you to do that.  But you have to have more than just a wing and a prayer, which is all you're presenting, because we just agreed, you do not have a shred of evidence about how Mr. Praytor ran his business -- or ran his investments.  So...

**MR. HASSON:**  Respectfully, Your Honor, I actually think that the analysis was sort of reversed here.  So if we have the largest financial interest, you know, the Court is supposed to focus on us alone.

**THE COURT:**  I don't -- first of all, I don't buy that. So I'm asking now -- we're past that.  I'm asking now about the typicality and adequacy and other requirements of Rule 23(a).

All right.  I think I've heard enough.

Okay.  Any last thoughts, Mr. Linehan, real quickly, with respect to Rule 23(a)?

**MR. LINEHAN:**  Charles Linehan.  I have nothing to add. I think your analysis is correct.

**THE COURT:**  Well, I mean, day trader, lots of volume.

**MR. LINEHAN:**  As we -- as stated in the reply brief, that is not, itself, disqualifying.  They would have to provide more to -- you know -- someone that buys and sells based on the purchase price is presumed to have done it based on the information that's in the market --

**THE COURT:**  Well, I mean, there is a -- if I go

forward with this, and I do make him the lead plaintiff -- I haven't decided yet -- but if I do, you know, if it turns out, in discovery, he's got an algorithm or something, he's going to be out.  You realize that.

MR. LINEHAN:  Yeah, that's fine.  Actually -- so while it's not his --

THE COURT:  Just -- I want you to look down the road. You don't have to say anything now.  But if it turns out that he -- you know -- he's some smart guy who's got an automated, AI-based trading system, you're going to have a problem.  So...

MR. LINEHAN:  So I've spoken to him about his trading, and that's not going on.

THE COURT:  That's not happening?

MR. LINEHAN:  That's not happening.

THE COURT:  Okay.

Now, a couple of things and then I'll get my decision out. Once I do this, I'm going to name a lawyer -- not a firm -- a lawyer -- that may be you if it's Mr. Praytor -- as lead counsel.  Okay?  So you can go back and tell your colleagues, good news, you're going to be the lead counsel.  That means for everything.

Now, on top of that, I will not approve cumbersome, complicated committee structures, liaison counsel.  We don't need any of that.  All right?  Now, you can run your case the way you think, but I'm just going to tell you now, I will

not -- I'll take a very jaundice eye to a request for fees, should that day come to pass, that has, you know, all these committees and liaisons and everything else.  I don't do that. And you can look at my many, many orders in my MDL cases and other class-action cases where I've made it clear that that will not be the case.  All right?  Just be aware of that.

MR. LINEHAN:  Understood.

THE COURT:  Okay.  Good.

Okay.  Defendant, anything you'd like to add?  You've been sitting here patiently.

MR. GHERARDI:  Daniel Gherardi, Your Honor.

Nothing to add from defendants.

THE COURT:  Who would you like to be the lead plaintiff?

MR. GHERARDI:  We take no position --

THE COURT:  Oh, take a vote.  Come one.  Give me a name.

MR. GHERARDI:  I respectfully decline, Your Honor. We're happy to defend against these allegations.

THE COURT:  This -- is your client -- is your client still in business?

MR. GHERARDI:  Absolutely, and doing quite well.

THE COURT:  What's the current stock price?

MR. GHERARDI:  I don't -- I haven't checked this morning, but in the triple digits.

**THE COURT:**  It is?

**MR. GHERARDI:**  Yes.

**THE COURT:**  What -- can you just tell me, what do they do?  I understand -- look, I have an EV.  I use a charger.  Are they making components or what are they doing?

**MR. GHERARDI:**  So we've actually defended this -- these defendants in a prior securities class action a few years ago.

**THE COURT:**  In front of Judge Freeman?

**MR. GHERARDI:**  In front of Judge Freeman.  That's correct.

**THE COURT:**  How come that went away?  I was going to --

**MR. GHERARDI:**  So we were successful on the first round motion to dismiss.  And plaintiffs decided not to pursue their claims.

**THE COURT:**  Not these plaintiffs.

**MR. GHERARDI:**  Not these plaintiffs.  None of these firms, Your Honor.

**THE COURT:**  Yeah.  Otherwise, there would be a Rule 41 issue, but you don't have that.

**MR. GHERARDI:**  Correct.  So Enphase Energy creates solar panels and the battery components converter technology that goes with them.  So my understanding -- I don't --

**THE COURT:**  Solar panels?

**MR. GHERARDI:** Solar panels. They don't -- I'm not sure whether they create the panels themselves. Their main product is the converter. I don't have --

**THE COURT:** The actual chargers though; right?

**MR. GHERARDI:** So it's the piece in between --

**THE COURT:** Oh.

**MR. GHERARDI:** -- is my understanding. So from what I understand -- and I didn't study solar technology or energy in any of my education -- but the solar panel collects the energy from the sun. That, then, needs to be converted into power that can be used by something like your electric vehicle.

**THE COURT:** Oh, so these are just solar-powered chargers -- just solar-powered chargers?

**MR. GHERARDI:** The main product at issue, in the current complaint, at least, is the converter. I believe it's called IQ8.

**THE COURT:** But that's just for the solar products?

**MR. GHERARDI:** Correct.

**THE COURT:** Oh, okay. I mean, aren't the vast majority of chargers just wired into the electrical grid?

**MR. GHERARDI:** That's true, except that I think, nowadays, for people that have solar panels on top of their house -- right -- they -- the whole -- I think the whole goal is to get off the grid; right? You may contribute back to the grid, but you're collecting more energy than you may need to

use on your day-to-day basis.  But you have to be able to convert that energy in one form or another into something that can be plugged into a 120 or 240 --

THE COURT:  Your client's making those converters?

MR. GHERARDI:  That's correct.  And distributing them either directly or through distributors.

THE COURT:  And what happened in front of Judge Freeman?

MR. GHERARDI:  So that was -- I believe the decision was in 2022.  I was counsel and our team was counsel in that case, as well.  We moved to dismiss.  We were successful both on falsity and --

THE COURT:  But with leave to amend; right?

MR. GHERARDI:  With leave to amend.  At the hearing, Judge Freeman was quite honest -- I believe that the 90-day-bounce-back period in that case was significantly higher than the pre-stock drop action -- or stock price.

THE COURT:  Oh, I see.  Okay.

MR. GHERARDI:  So, you know, while not necessarily appropriate at the motion to dismiss stage, it was the sort of thing where even were they to be able to amend -- and there were no allegations that we think they could have added -- damages would have been a very difficult --

THE COURT:  But this was a different -- this is a much longer damages period; isn't it?

**MR. GHERARDI:** I don't recall the specific class period in the 2020 action that was resolved in 2022. But I don't believe that the 90-day lookback period -- I think counsel on the other side --

**THE COURT:** Okay.

**MR. GHERARDI:** -- gave the specific number. But I don't know that it surpassed the pre -- the $200, or so, share price.

**THE COURT:** Oh, it didn't. I think it was 168 or something.

**MR. GHERARDI:** I think that's correct, Your Honor. I don't have the specific number. So -- so, I think, in that respect, this case is different than the prior action. I think the first filed action in this case was filed in front -- or assigned -- to Judge Freeman. That was voluntarily dismissed. That's the *Bialic* case. And so now we're --

**THE COURT:** After she issued her motion -- or her dismissal --

**MR. GHERARDI:** No, I'm sorry. The first filed action this year, in the last six months or so.

**THE COURT:** Oh, yes. Okay. All right.

**MR. GHERARDI:** So -- but, yes, the -- the *Hurst v. Enphase Energy* case, in 2020 I believe it was filed, was dismissed after the first option. And plaintiff's counsel in that case elected not to amend or appeal.

THE COURT:  Okay.

Okay.  Thanks very much.

MR. GHERARDI:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

(Proceedings adjourned at 10:44 a.m.)

---oOo---


## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, October 18, 2024




_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court