CHARLES H. LINEHAN (#307439)
*clinehan@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorney for Lead Plaintiff Lon D. Praytor*
*and Lead Counsel for the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| WAYNE HAYES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENPHASE ENERGY, INC., BADRINARAYANAN KOTHANDARAMAN and MANDY YANG,<br><br>Defendants. | Case No. 3:24-cv-04249-JD<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge: James Donato |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 4

III. PARTIES ........ 4

A. Lead Plaintiff ........ 4

B. Defendants ........ 5

IV. BACKGROUND ........ 6

A. Overview of the Company ........ 6

B. Financing Solar Systems For Residential Homes In The United States ........ 7

C. Factors Impacting Enphase's Business Prospects In Domestic And European Residential Solar Markets ........ 8

1. Enphase Generates The Majority Of Its Revenue From Residential Solar Markets Throughout The United States ........ 8

2. European Residential Solar Market ........ 12

V. SUBSTANTIVE ALLEGATIONS ........ 13

A. Prior To The Class Period, Defendants And Market Analysts Closely Monitored California's NEM 3.0 Debate ........ 13

B. As The Market Braced For California's NEM 3.0's Impact On Solar-Only Systems, Defendants Misleadingly Assured Investors Enphase Was Not Experiencing Pull Forward In Demand ........ 16

C. During The Class Period, Defendants Misleadingly Assured Investors That Enphase's Business Would Not Be Materially Impacted By The Increasing Interest Rates ........ 19

D. Defendants Shocked Investors By Revealing On April 25, 2023 That (1) Enphase *Did* Experience Pull Forward In Early 1Q23 Ahead Of NEM 2.0 Grandfathering Deadline, and (2) Interest Rates Materially Hurt Enphase's Demand/Sales – Leading To Disappointing 2Q23 Guidance ........ 21

E. Analysts' Reactions To The April 25, 2023 Disclosures Confirm That Defendants Misled The Market About (1) Enphase's Pull-Forward Sales Pattern In California; And (2) Enphase's Vulnerability To Rising Interest Rates ........ 23

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD ........ 25

VII. LOSS CAUSATION ..... 26
VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 27
IX. CLASS ACTION ALLEGATIONS ..... 30
X. APPLICABILITY OF PRESUMPTION OF RELIANCE ..... 32
XI. NO SAFE HARBOR ..... 33
XII. CLAIMS FOR RELIEF ..... 34
XIII. PRAYER FOR RELIEF ..... 37
XIV. JURY TRIAL DEMANDED ..... 38

Lead Plaintiff Lon D. Praytor, individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Enphase Energy, Inc. ("Enphase" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Enphase; and (c) review of other publicly available information concerning Enphase.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Enphase securities between February 7, 2023 and April 25, 2023, inclusive (the "Class Period"). Lead Plaintiff pursues claims against Defendants (as defined herein) under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Enphase designs, develops, manufactures, and sells home solar energy solutions, including microinverters (solar panels), batteries, and EV chargers. While the Company generates revenue from the sale of its microinverters, batteries, and EV chargers, among others, its microinverter sales in the U.S. comprise the vast majority of Enphase's revenue. Notably, Enphase derives approximately 20% of its revenue from the state of California alone.

3. A residential solar system is generally expensive with the average up-front cost ranging from about $13,000 to $14,800 with applicable federal tax credits. Because of this, residential solar panel customers historically opted for the leasing option, which was dominated by Tier 1 installers with Enphase focusing on the lower tiers of installers (known as long-tail installers), which tend to be more regional and operate more locally.

4. Though historically residential solar customers favored leasing options, over time the increased availability of financing options enabled residential solar systems to be financed with loans, which allowed more long-tail installers to enter the solar market resulting in a more fragmented solar market.

5. Beginning in March 2022, U.S. interest rates started to climb. Analysts closely monitored the rapidly increasing interest rates and when the residential solar market would shift from loan financing to leasing of solar systems. On January 31, 2023, Bank of America Securities analysts warned that the market should "[e]xpect a moderated impact for the resi solar names, ***with the greatest risk for those catering most directly to the 'long-tail' of independent installers***."[1]

6. In California, a net energy metering policy (NEM 2.0) was in effect since July 1, 2017. A proposed revision to that policy was made on December 13, 2021, when the California Public Utility Commission ("CPUC") issued a proposed decision substantially lowering the compensation rate for residential solar customers selling electricity to the grid. A public outcry ensued. The vote on the proposed decision was delayed and the record was re-opened to allow for further consideration of certain aspects of the proposed rules.

7. During that time, Enphase and analysts covering the Company closely monitored any developments and assessed the impact that NEM 3.0 could have on Enphase.

8. Ultimately, on December 15, 2022, the CPUC approved a revised proposed decision (NEM 3.0). This new version moderated the reduction in the value of the credits residential customers would receive for selling energy into the grid and included grandfathering provisions that allowed new solar customers to qualify for NEM 2.0 if they applied for grid connection by April 14, 2023 and made grid connection by April 15, 2026.

9. The Class Period begins on February 7, 2023, when the Company held an investor call to discuss its financial results for 4Q 2022 ("4Q22 Earnings Call"). Aware of rising interest rates, and the potential (negative) implications it had on Enphase's residential solar business, Defendant Kothandaraman addressed "see[ing] some analyst reports about a possible shift from loans to PPA [leasing] due to the high prevailing interest rates." He misleadingly assured investors that the Company's "installer base is very diverse, both small and large installers that offer cash, loans, and PPA options for homeowners. ***Any shift from one type of financing to another only has a minor impact to our business almost negligible***."

---

[1] Unless otherwise noted, all emphasis is added throughout.

10. Also during the 4Q22 Earnings Call, Defendants acknowledged California's NEM 3.0 adopting a steeper glide path than Enphase had hoped, but spun this development as a positive. When asked by analysts if Enphase had seen a "pull-forward" on demand in California, Kothandaraman responded, "[o]n NEM 3.0, ***we aren't really seeing any pull forward right now*** . . . . so far, ***we haven't seen any pull-forward demand yet***."

11. Unbeknownst to investors, however, (1) Enphase's business was particularly vulnerable to fluctuating interest rates because, contrary to Defendants' representation, Enphase's installer base was weighted significantly towards loan-heavy installers during the Class Period; and (2) Enphase had already seen a material pull-forward of demand, in late December 2022 through mid-late January 2023.

12. On April 25, 2023, Enphase stunned the market when it announced its 1Q 2023 financial results and 2Q 2023 outlook, the latter of which was 4% below consensus. Defendant Kothandaraman told investors that U.S. revenue decreased 9% sequentially and sell-through of microinverters decreased 21% sequentially compared to 4Q 2023, which was worse than the normal seasonality decline of 15%. He also noted that "sell-through in California was only 9% lesser than Q4" because "California installers took advantage of the NEM 2.0 rush" and as a result, "***built up a solar backlog for the next 3 to 4 months***." Kothandaraman also stated that "[s]ell-through of our batteries in California was 23% lesser in Q1 compared to Q4 as installers focused mainly on solar. ***We expect this trend to continue for the next 3 to 4 months***." Kothandaraman also told investors "the sell-through was even lower in states with low utility rates, such as Texas, Florida and Arizona" because "the economics of loan financing worsened due to rising interest rates" and that "***[l]eases to long-tail installers [hadn't] been ramped until now***." When pressed by analysts for clarity on how temporary the impact on installations would be, Kothandaraman admitted "[t]hat is going to be stress on those numbers because interest rates were high, but there are ***going to be some innovation in financing, innovation in loans, innovation in leases that are going to come. It's going to provide more access to our long-tail installers***." He elaborated, "[t]he ***demand will unleash only when the interest rates are back to normal***. But until then, it will get incrementally better compared to Q1."

13. On this news, the Company's share price fell $56.77, or 25.73%, to close at $163.83 per share on April 26, 2023, on unusually heavy trading volume, with a corresponding market cap drop of $7.78 billion, or 25.73%, to close at $22.45 billion.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

18. Lead Plaintiff Lon D. Praytor, as set forth in the Certification filed concurrently herewith and incorporated by reference herein, acquired Enphase securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**B. Defendants**

19. Defendant Enphase is incorporated under the law of Delaware with its principal executive offices located in Fremont, California. Enphase's common stock trades on the Nasdaq Global Market ("NASDAQ") under the symbol "ENPH."

20. Defendant Badrinarayanan Kothandaraman ("Kothandaraman") was at all times relevant the Company's Chief Executive Officer, President, and Director. Kothandaraman joined Enphase in April 2017 as Chief Operating Officer and became its new President and CEO in September 2017 after the sudden departure of founder and long-term CEO, Paul Nahi, in early August 2017. Kothandaraman started his career at Cypress Semiconductor in 1995 and worked in process technology development and chip design before becoming vice president of the Asynchronous SRAM Business in 2008. From 2008 to 2011, Kothandaraman was responsible for Cypress's Memory Products Division and served as the executive director of Cypress Semiconductor Technology India Private Limited from 2012 to 2016. Kothandaraman received his B.Tech degree from IIT Madras, M.S. degree in materials science from U.C. Berkeley, and attended the Stanford Executive Program in 2008.

21. Defendant Kothandaraman ("Individual Defendant") because of his position in the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Individual Defendant made the statements alleged herein to be misleading and thus had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to him, Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public and that the positive representations which were being made were then materially false and/or misleading. Individual Defendant is liable for the false statements herein.

## IV. BACKGROUND

### A. Overview of the Company

22. Founded in 2006, Enphase[2] designs, develops, manufactures, and sells home solar energy solutions, including microinverters (essentially solar panels), batteries and EV chargers. The Company's microinverter technology converts power from direct current to alternating current at the individual solar module level, rather than at a centralized location. This means that the failure of any individual microinverter does not jeopardize the reliability of the system overall.

23. The Company generates revenue from the sales of its microinverters (and related accessories), storage solutions, EV charging solutions, among others. While Enphase reports operations in a single segment, analysts from Bank of America, in a report dated February 8, 2023, provided the following estimated breakdown of the Company's 2022 revenue, with microinverter sales comprising nearly all of Enphase's revenue:

| Enphase Revenue (by product) | 2022 Revenue | Percentage of Total 2022 Revenue |
|---|---|---|
| Residential Microinverter | $1.94 billion | 82.7% |
| Commercial Microinverter | $100,000 | 0.4% |
| Storage | $375.6 million | 16.0% |
| EV Charging | $30 million | 1.3% |
| Total | $2.346 billion | 100.4% |

24. As made clear by the table above and confirmed in the Company's Form 10-K for the year ending 2022 filed with the SEC on February 13, 2023 ("2022 Form 10-K"), though Enphase targets both the residential and commercial solar markets, the vast majority of Enphase's microinverters have been sold to end users for residential applications. The residential and commercial markets targeted by Enphase include, among others, the United States, Canada, Mexico, and Europe.

25. Enphase relies primarily on distributors, installers, and providers of solar financing to assist in selling Enphase products to customers. Enphase principally sells its products to solar

[2] The Company was originally founded in March 2006 under the name PVI Solutions, Inc. in the State of Delaware and subsequently changed its name to Enphase Energy, Inc. in July 2007.

distributors who then combine Enphase's solar module products and racking systems from other companies. Those distributors then resell to installers in a particular target region. Enphase also sells directly to select large installers, original equipment managers (OEM), and strategic partners. OEM customers include solar module manufacturers who integrate Enphase's microinverter with solar module products and resell to both distributors and installers. Strategic partners include a variety of companies including providers of solar financing solutions.

**B. Financing Solar Systems For Residential Homes In The United States**

26. In 2022, the average up-front cost for a residential solar panel installation generally ranged from about $18,000 to $22,000 without any tax credits to about $13,000 to $14,800 with federal tax credits.

27. To finance a residential solar panel installation, customers generally have three options: (1) leasing (installer/third-party retains ownership of the system); (2) loan financing; or (3) all-cash purchase. Historically, residential solar panel customers had only leasing options (dominated by Tier 1 installers)[3] or cash purchase options available, with most residential customers choosing the former, where the installer/third party owner is the lessor and the homeowner is the lessee. Leasing can be done through a solar power purchase agreement (or PPA). A PPA is a financial agreement where a developer/installer arranges for the design, permitting, financing and installation of a solar energy system on a customer's property at little or no cost. The developer/installer sells the power generated to the host customer at a fixed rate that is typically lower than the local utility's retail rate. In addition to the income from the electricity sales, the developer/installer also receives any tax credits and other incentives generated from the system.[4]

28. The leasing option hit a peak of over 70% in 2014 and steadily declined since then to about 20% in 2022. Increased availability of financing options enabled residential customers to

---

[3] The U.S. installation market is a tiered system with "Tier 1" broadly encompassing the largest installers that are publicly traded (e.g., Tesla Inc., Sunrun Inc., SunPower, etc.). Lower tiers of installers (known as long-tail installers) tend to be more regional and operate more locally. Enphase focuses on Tiers 2 and 3 markets.

[4] https://seia.org/research-resources/solar-power-purchase-agreements/

finance their solar systems with loans. This weakened the Tier 1 installers' stronghold over the solar market and allowed long-tail installers to enter, resulting in a more fragmented solar market.

29. In or around 2022, Enphase posted a video to its website titled, "Q Meets A" that purportedly answered the "frequently-asked" question, "What financing is available for solar systems?" for a potential customer interested in a solar installation. When discussing the loan financing option, the Enphase representative noted that "solar is considered a very low-risk kind of loan for financiers, so interest rates are very low for solar loans." He also noted that in recent years "most people [were] choosing to purchase" with "cash or a solar loan" to "get the federal tax credit, which reduces the cost."[5]

### C. Factors Impacting Enphase's Business Prospects In Domestic And European Residential Solar Markets

#### 1. Enphase Generates The Majority Of Its Revenue From Residential Solar Markets Throughout The United States

30. The vast majority Enphase's revenue is generated from the U.S. residential solar market. More specifically, the Company's 2022 Form 10-K reported revenue generated from the U.S. market represented 76%, 80% and 82% of Enphase's total revenue for the annual periods ending on December 31, 2022, 2021 and 2020, respectively.

##### a) California Residential Solar Market

31. In an August 2022 report, Barclays analysts estimated that the state of California made up about 40% of the total residential solar market in the United States.

32. During the 4Q22 Earnings Call on February 7, 2023, Kothandaraman confirmed that approximately 20% of Enphase's revenue was derived from California's solar market. According to FE1, Enphase dedicated as much as 40% of the Company's regional sales managers to the state of California.[6]

###### (i) Net Energy Metering Policies

33. Net energy metering policies vary by state, but essentially they allow residential and

[5] https://enphase.com/energy-101/financing-solar

[6] Former employee 1 ("FE1") was a commercial sales manager at the Company from February 2021 through April 2023.

commercial customers to sell excess generated power back into the grid. Effectively, an electricity meter will run backwards to provide a credit against the electricity that is consumed at night when the sun isn't shining or periods when demand is greater than the supply coming from the solar system. Each state differs in how Net Energy Metering (NEM) is implemented and at what level customers are compensated for their excess power. According to the Solar Energy Industries Association (SEIA), on average, only 20-40% of a solar energy system's output ever goes into the grid, and this exported solar electricity serves nearby customers' loads.

34. On December 13, 2021, the CPUC issued a proposed decision concerning changes to NEM 2.0 (which had been in effect since July 1, 2017) and proposing a new rate structure under NEM 3.0. Among other things, the proposed decision (1) substantially lowered the rate that residential solar consumers would receive when selling extra energy to the grid, (2) created a "grid participation charge" of $8 per kilowatt on the solar systems of residential customers, and (3) provided a "glide path" so that the change to the new export compensation rate would be gradual.

35. The solar industry reacted very negatively to the proposal, arguing that the rules severely disincentivized continued growth in residential installations and that those residential installations are necessary to alleviate strain on California's power grid and to help the state achieve its greenhouse gas reduction goals. Bernadette Del Chiaro, the executive director of the California Solar & Storage Association ("CSSA"), stated that the new NEM 3.0 proposal was "an absolute disaster" and warned that "[t]he market will go right over a cliff." An analysis from Wood McKenzie predicted that the California residential solar market would be cut in half by 2024.

36. In January 2022, following an outcry from solar industry representatives and protests by solar rooftop customers, the CPUC delayed a vote on the proposed decision. In May 2022, an administrative law judge assigned to the NEM 3.0 proceedings issued a ruling reopening the record to allow further consideration of three aspects of the proposed rules: (1) the glide path approach; (2) non-bypassable charges on gross consumption; and (3) community distributed energy resources. On June 10, 2022, parties filed comments responding to questions on these issues, and on July 1, 2022, the parties filed reply comments. The record was resubmitted on July 1, 2022.

37. On November 10, 2022, the administrative law judge withdrew the December 13, 2021 proposed decision and issued a new proposed decision. Following oral argument and the submission of additional comments, a further revised proposed decision was issued on December 14, 2022. On December 15, 2022, the CPUC approved the revised proposed decision.

38. The main differences between the original NEM 3.0 proposal issued in December 2021 and the final version approved in December 2022 were (1) the new version moderated the reduction in the value of the credits that residential customers would receive when selling energy back to the grid, and (2) the new version eliminated the "grid participation charge" that residential customers would have been required to pay under the December 2021 proposal. In addition, the NEM 3.0 rules included grandfathering provisions allowing existing solar customers to maintain their rates under the NEM 2.0 structure for a legacy period of 20 years from the date of their interconnection to the grid. New solar customers could still qualify for the NEM 2.0 structure by applying for grid connection by April 14, 2023 and making that grid connection by April 15, 2026.

39. The reaction was mixed. On the one hand, the final version of NEM 3.0 approved in December 2022 was not as draconian as the version proposed in December 2021. On the other hand, the final version of NEM 3.0 still adopted a materially lower rate (by about 75%) for electricity sold back to the grid for new solar customers than under NEM 2.0, and the glide path was harsher than the solar industry had sought. According to a November 13, 2022 report by BMO Capital Markets, "While substantially better than the previous version of NEM 3.0 rules, . . . initial savings rates using the lower export rates compared with NEM 2.0, even without the grid participation charge, will likely create some headwinds on California growth relative to prior years."

40. According to a December 16, 2022 report by Deutsche Bank Research:

- **The new policy cuts down by ~ 75% the amount/compensation solar customers can receive when they sell extra energy into the grid**, which will now be based on an Avoided Cost, rather than on a full retail basis. The average export rate in California will drop to ~$0.05-0.08/kWh, vs currently an average of $0.25-0.35/kWh. **This is one of the largest export rate cut[s] happening in the US**.
- **California is the major US residential market for solar**, with a penetration rate close to 25%, and more than half of PV systems installed in the state this year. However, with the implementation of the

> NEM 3.0, we expect **solar adoption to slowdown in 2023 and potentially onwards**, as demand will be impacted by the export rate cut. Solar panels systems payback could almost double up, and will be well over 10-12 years vs currently 7-9 years in the state.
>
> - We likely will see an **unusual seasonality pattern in California going into 2023, with an acceleration of installations in 1Q through mid-April 2023, as customers will attempt to take advantage[] of the grandfathering clause**. This will be followed by a slowdown in demand once NEM 3.0 is implemented, although it could be partially offset by the overall positive incentive environment with the Inflation Reduction Act (IRA) and 30% ITC extension.

(Some emphasis in original).

41. A report by Bank of America Securities analysts released on January 31, 2023, provided insight on the then current solar demand outlook and product from a former lead residential solar executive. The report stated in part:

> - **CA remains the market to watch ahead of Net Energy Metering (NEM) 3.0 implementation in April 2023**, and our conversations suggest several dealers are seeing a slow start to the year in January. Some CA dealers are seeing sales down -15% in January y/y, and dealers in the most exposed markets to higher interest rates: TX and FL noted -25-30% y/y for the same January period.
> - But what appears to us to be intriguing is sales inquiries in California remain up **suggesting early indications of the 'rush' ahead of NEM 3.0 deadline**: watch the 'mini boom' materialize in orders by April.

**b) Residential Solar Market Outside Of California**

42. According to the U.S. Solar Market Insight report from Wood Mackenzie and the Solar Energy Industries Association, state rankings for solar PV installation rankings for 2022 and 2023 were as follows:

| Rank | 2022 | Installations ($MW_{dc}$) | 2023 | Installations ($MW_{dc}$) |
|---|---|---|---|---|
| 1 | California | 5,115 | Texas | 11,728 |
| 2 | Texas | 4,898 | California | 6,359 |
| 3 | Florida | 2,067 | Florida | 3,220 |

Based on the above table, for 2022 and 2023, Texas and Florida exhibited the most residential solar deployments outside of California. According to a April 26, 2023 report published by Bank of

America Securities analysts, California, Texas, Florida, and Arizona accounted for 2/3rds of U.S. growth in 2022.

43. In 2022, Enphase touted its presence in both Texas and Florida's residential solar market. For example, in June and December 2022, Enphase announced that installers of Enphase products in Texas and Florida, respectively, saw growing deployments of Enphase Energy Systems powered by IQ8 Microinverters. Citing the U.S. Solar Market report from Wood Mackenzie and the Solar Energy Industries Association, Texas and Florida residential solar deployments were expected to reach over 440 MW and 500 MW, respectively, by the end of 2022.[7]

44. Analysts covering the solar power industry also focused on the residential solar market in Arizona. Just one month before the start of the Class Period, in January 2023, Enphase announced that installers saw growing deployments of Enphase Energy Systems powered by IQ8 Microinverters in Arizona, which was forecasted to reach 206 MW in 2023, representing a 20% increase over 2022.[8]

45. Demand for financing residential solar installations with loans versus leasing in states like Texas, Florida, and Arizona (where the cost of power is lower than a state like California) is more susceptible to fluctuations in interest rates. For example, Bank of America Securities analysts illustrated this "simple" math on April 26, 2023:

> At a 8.5% APR loan we with no issue discount (aligned to Home Equity Loan- or HELOC rates today), a relatively standard 7-8kW system covering ~800kWh of monthly use backs out to ~$130-140/mo against a $2.80/w Capex assumption. **This compares with average bills in FL, TX and AZ in the $100-120/mo range meaning the easy "solar can save you money" sale is effectively on hiatus**.

### 2. European Residential Solar Market

46. Of the approximately 24% of Enphase's 2022 revenue generated outside of the United States, about half came from its European operations.

---

[7] https://investor.enphase.com/news-releases/news-release-details/enphase-energy-expands-iq8-microinverter-deployments-texas; and https://investor.enphase.com/news-releases/news-release-details/enphase-energy-expands-iq8-microinverter-deployments-florida.

[8] https://investor.enphase.com/news-releases/news-release-details/enphase-energy-expands-iq8-microinverter-deployments-arizona.

## V. SUBSTANTIVE ALLEGATIONS

47. Near the end of 2022 and during the first quarter of 2023, the market was keenly focused on changing macroeconomic factors and their financial impact on the Company, including (i) when the Company would see a much anticipated "pull forward" of demand ahead of the grandfathering deadline for NEM 2.0 in California, (ii) how the market in California would fare following the effective date of NEM 3.0, and (iii) the impact of rising interest rates on Enphase's business in the rest of the U.S. During this period, Defendants misleadingly reassured the market that the Company was not seeing any pull forward due to NEM 3.0 and that even if the solar market moved from loans to leases in response to rising interest rates, Enphase's business would not be materially impacted.

### A. Prior To The Class Period, Defendants And Market Analysts Closely Monitored California's NEM 3.0 Debate

48. Throughout the period during which NEM 3.0 was being evaluated and revised into its final form (*i.e.*, between roughly December 13, 2021, when the initial proposed decision for NEM 3.0 was issued, and December 15, 2022, when the final proposed decision for NEM 3.0 was approved), both Enphase and securities analysts covering the Company were closely monitoring developments and assessing the impact that NEM 3.0 would have on Enphase.

49. For example, during Enphase's 4Q 2021 earnings call on February 7, 2022 (the first earnings call following the initial proposed decision for NEM 3.0 rules issued on December 13, 2021), Kothandaraman criticized the proposed decision, stating that it "unfairly penalizes solar-only systems" and that Enphase would be working with other stakeholders to try to obtain a "better outcome:"

> Next, I would like to comment on the California NEM 3 proposed decision, or PD, which was announced originally in December. **In our opinion, the PD in its current form unfairly penalizes solar-only systems by imposing fixed charges, significantly reducing export compensation and retroactively changing the length of the original NEM contract.** The PD was meant to encourage the transition from solar-only to solar plus storage. While we believe this transition is a correct long-term goal to meet California's energy targets, storage is not yet fully mature or 100% attached in terms of cost, in terms of supply, in terms of permitting, warranty and training. We would like to see a modified PD where the fixed charges are

> removed, the original length of the existing NEM contracts are restored, and a multiyear glide path is established to gradually reduce the export compensation. **We are working diligently with various stakeholders to try and influence a better outcome in order to eliminate any market disruptions and create a win-win for all rate payers and utilities**.

50. During the same call, an analyst from Goldman Sachs asked if Enphase was anticipating or experiencing a "pull forward" in demand in California due to the proposed decision, with customers attempting to take advantage of the more favorable rate structure under NEM 2.0 before the potentially draconian terms of NEM 3.0 came into effect:

> Brian Lee (Goldman Sachs): . . . And then another kind of question around pull forward. Is your Q1 outlook -- I don't think it does but **do you anticipate having any pull-forward demand from NEM 3.0 uncertainty in California in Q1? Or is that something we might maybe see in 2Q? Just wondering if you've either seen any of that or you're forecasting to have some of that in the next couple of months here**.
>
> Kothandaraman: . . . Brian, the last portion of the question, can you please repeat so I can answer?
>
> Lee: Yes, Badri. Just you alluded to NEM 3.0 uncertainty in your opinion on what needs to change. But in terms of impact on your business, **are you actually seeing any demand pull forward in the state of California due to that uncertainty in your Q1 outlook? Or is that something you maybe anticipate would start to show up in Q2 if that uncertainty around NEM 3.0 continues to persist?**
>
> Kothandaraman: Yes. If I were to see the situation before December and after December, I wouldn't say -- if I were to extrapolate to the situation**, I would not say there has been a pull-through. And I'm not sure if I can predict Q2, but you saw the -- you saw that the PD decision is delayed. I don't know when the new schedule is but that's good news in general. I guess the installers are taking a breather right now**.

51. An analyst from BofA Securities asked a follow-up question about a potential pull forward in demand in California and when Enphase might expect that to occur:

> Julien Patrick Dumoulin-Smith (BofA Securities): . . . I mean given the lead times that you described, I mean conceivably, you have visibility into -- well into second quarter as you start to think about that 16 weeks out and what that means on your thought process here. I mean you also said you're not going to comment on when you break that 180-megawatt-hour threshold here. But **can you elaborate a little bit more on how you're thinking about the year shaping up . . . especially given the potential pull forward that could manifest**

> **once you get clarity on that policy as well as just the underlying demand?** I mean as you've already alluded to and has already been discussed, I mean demand seems strong. You've posted good numbers, 4Q, 1Q. Conceivably, you've got some degree of visibility into the year. I mean maybe a little further parameters on how you're thinking about even stacking and securing supply around what a number above 180 might look like as well.
>
> Kothandaraman: Yes. I mean just to tell you, you are right. Lead time is 14 to 16 weeks. So we have good visibility on the situation in Q2. And because now we have time for Q2, we are getting things ready. And like what I said, our business is very strong. But we are not going to guide Q2 for now. I'm going to have Raghu talk about the NEM situation and how he sees that thing.
>
> Raghuveer R. Belur, Co-Founder & Chief Products Officer, Enphase Energy, Inc.: Yes. With regards to NEM 3, the original decision, which was supposed to happen now, had it come into effect at least 4 to 5 months after the decision was made. And then it also required additional time for the utilities to gear up for that change. So realistically, it was late 2022 or even in 2023 is when it would take -- come into effect. So **I think from a pull-through in demand, it would probably not be seen in at least for the next few quarters**. It's likely going to be -- if there is -- **if NEM 3 holds in its current form, which is -- may not be likely, demand pull-through is likely to happen end of the year or even sometime early next year**.

52. Both the Company and the analyst community were acutely focused on the issue of NEM 3.0, how it might affect the demand for Enphase's products, and whether (and when) the transition to NEM 3.0 might disrupt the flow and timing of Enphase's sales via a "pull forward" of demand prior to the effective implementation of the new rate structure.

53. Over the next several quarters, Defendants provided periodic updates on the NEM 3.0 process and proceedings, but there was little to report until the new proposed decision was issued by administrative law judge. During Enphase's 1Q 2022 earnings call on April 26, 2022, Kothandaraman stated:

> I would also now like to comment on the California NEM 3.0 proposed decision RPD, which was announced in the December of 2021. We expect a modification to the current PD and an opportunity for stakeholders to participate and provide their feedback to the California PUC. **We've been actively participating in the process and will continue to work diligently with various stakeholders to try and influence the best outcome**.

54. During Enphase's 2Q22 earnings call on July 26, 2022, Kothandaraman stated:

> I'd like to comment on a recent policy issue that is impacting the solar industry. As it pertains to [NEM 3.0] in California, **we submitted our comments to the proceeding in late June. We hope the CPUC will review the feedback from all stakeholders and eliminate the grid participation charge while providing a glide path for the solar-only market and incentivizing the solar plus storage market**.

55. During Enphase's 3Q 2022 earnings call on October 26, 2022, Kothandaraman stated:

> Next, I'd like to comment on NEM 3.0 in California. As of now, there is still no decision from the California Public Utilities Commission, CPUC. **We hope the CPUC eliminates the grid participation charge while providing a glide path for the solar only market, as well as incentivizing the solar-plus-storage market**.

56. On December 15, 2022, the CPUC approved the final version of NEM 3.0. As detailed in ¶¶38-41, *supra*, the final rules were not as harsh as the original version, but they still provided lower compensation for residential solar customers than NEM 2.0 and adopted a steeper glide path than the solar industry had sought. As explained in the 260-page proposed decision that was ultimately adopted, the administrative law judge considered several different approaches to the glide path, including the ACC ("Avoided Cost Calculator") Plus approach, the Market Transition Credit approach, and the retail rate step-down approach. Enphase, the CSSA, and other solar companies and organizations supported the retail rate step-down approach, but NEM 3.0 ultimately adopted the ACC Plus approach.

### B. As The Market Braced For California's NEM 3.0's Impact On Solar-Only Systems, Defendants Misleadingly Assured Investors Enphase Was Not Experiencing Pull Forward In Demand

57. On February 7, 2023, the start of the Class Period, Enphase held its earnings call for 4Q 2022. During this call, Defendant Kothandaraman acknowledged that NEM 3.0 had adopted a steeper glide path than Enphase had hoped, but spun that development as a positive, explaining that Enphase's products and technologies positioned the Company to take advantage of the new net metering system:

> Next, I'd like to comment on NEM 3.0 in California. **The CPUC has finalized its decision on NEM 3.0 in Q4. While we wish the export rates had been stepped down a little more gradually, the policy is generally in the right direction for incentivizing homeowners to adopt storage**.

> **The next step is for installers to educate homeowners to increase adoption of NEM 3, and companies like Enphase need to help in making this transition possible**. That's where Solargraf design and proposal engine comes in. **Installers will be able to use Solargraf to provide homeowners with a proposal that optimizes their bills under NEM 3 tariff to minimize payback and maximize ROI**. The advantage with Solargraf is that the underlying algorithm used by its engine will be the same as what is used in the actual operation of the Enphase home energy system.
>
> **As the system complexity increases with solar, batteries, EV chargers, and dynamic rate structures such as NEM 3.0, the tight coupling of Solargraf and actual product operation will maximize value to homeowners**. In summary, we are quite pleased with our performance. As a reminder, our strategy is to build best-in-class home energy systems and deliver them to homeowners through our installer and distributor partners, enabled by the installer platform. We have many new products that are coming out in 2023, that will increase our served available market and positively contribute to the top line.

58. During the same call, Defendant Kothandaraman was asked again about whether there were any indications of a pull forward in demand due to the adoption of NEM 3.0. Kothandaraman insisted that Enphase had not yet seen any signs of a pull forward:

> Brian Lee (Goldman Sachs): First question I had was just around NEM 3.0. I think there's different implications of that policy uncertainty near term and medium term from what we're hearing. So maybe just wanted to get your thoughts. **Near term, some views out there that maybe there's a pull forward on demand in California. Would be curious what you're seeing with respect to that**. And then kind of in the medium term, we're hearing the industry is still maybe trying to figure out how to navigate this. So curious how you specifically are thinking about the second half of 2023 in the U.S.? Are you kind of base casing California to be down significantly? And then how do you see yourself navigating that if that's the case? Are you driving more products to other states, focusing more in Europe? Just curious just how you'd be thinking about planning into that period of higher policy uncertainty in the back half. And then I had a follow-up.
>
> Kothandaraman: Yeah. **On NEM 3.0, we aren't really seeing any pull forward right now**. But in talks with few installers in California, both big and small, like what I said, the originations are up strongly. They are all quite optimistic.
>
> And maybe we will see something soon that's why I talked about an optimistic Q2. **But so far, we haven't seen any pull-forward**

> **demand yet**. Now on talking about NEM 3.0 in general. NEM 3.0 is going to be incredibly positive for us.

59. Following the Company's 4Q22 Earnings Call, analysts covering the Company repeated Kothandaraman's assurance to the market that Enphase was ***not*** seeing any pull-forward on demand following NEM 3.0 adoption:

> **Piper Sandler**: ENPH indicated that it hasn't really witnessed any pull-forward from NEM-3. We believe this makes intuitive sense as we believe a demand pull-forward will result in a meaningful uptick in installers backlog that will enable decent Q3 installation activity but not necessarily and meaningful uptick in installation activity for Q1.
>
> **Cowen**: To date, Enphase has not seen any pull forward demand related to NEM 3.0 though originations are strong in CA. We note CA accounts for ~20% of revenue for Enphase.
>
> **Deutsche Bank**: ENPH mentioned usual seasonality is 15%, and January 2023 has seen lower data, driven by California impacted by bad weather in the first two weeks of January. There has also been weaker-than-anticipated pull-forward demand from the NEM 3.0. However, management mentioned that originations are starting to pick up, and with a lead time of about 2 months, we could then expect a stronger end to the quarter and into early April, right before the implementation of NEM 3.0 (April 15, 2023).

60. However, while Kothandaraman insisted that Enphase had not experienced any indications of a pull forward to that date, it appears that this is precisely what occurred. According to FE2, in the quarter following NEM 3.0, solar energy companies, including Enphase, actually did well because of their backlogs of batteries.[9] FE2 stated that Enphase had "a five-month backlog for shipment in California" and "they could sell a ton of product." However, this situation quickly changed. According to FE2, "30-45 days into NEM 3.0, boom. It was like, 'Why are sales so crappy?'"

61. The most reasonable inference from these facts is that Enphase did in fact experience a pull forward in demand during December of 2022 and January of 2023 and that by February 7, 2023, Enphase had already experienced a severe decline in sales due to this pull forward. The final proposed version of NEM 3.0 was approved on December 15, 2022, so 30-45 days into NEM 3.0

[9] Former employee 2 ("FE2") was a senior technical sales consultant with the Company from April 2021 through May 2023.

would be somewhere between January 14, 2023 and January 29, 2023. Thus, the most plausible inference from FE2's account is that Enphase experienced strong sales during the latter part of December 2022 and early January 2023, but by February 7, 2023, Enphase had already experienced somewhere between one to three weeks of "crappy" sales when the rush to take advantage of the grandfathering provisions for NEM 2.0 suddenly dried up. Even if Defendants believed that there might be a second wave of customers who could try to take advantage of the grandfathering provisions before the April 14, 2023 deadline, it was materially misleading for Kothandaraman to say "we haven't seen any pull-forward demand yet," when Defendants had already observed the classic signs of a pull-forward: a strong surge in sales followed by a sudden drop-off.

62. FE3 confirms FE2's observations about Enphase's sales. FE3 recounted that "a non-trivial percentage of earnings fell off due to NEM 3.0" and as a result "totally threw off" the California market, which was "major" for Enphase.[10]

### C. During The Class Period, Defendants Misleadingly Assured Investors That Enphase's Business Would Not Be Materially Impacted By The Increasing Interest Rates

63. Starting in March 2022, the Federal Reserve began raising interest rates as follows:[11]

| Date | Rate Change (Bps) | Federal Funds Rate |
|---|---|---|
| March 17, 2022 | +25 | 0.24% to 0.50% |
| May 5, 2022 | +50 | 0.75% to 1.00% |
| June 16, 2022 | +75 | 1.5% to 1.75% |
| July 27, 2022 | +75 | 2.25% to 2.50% |
| Sept. 21, 2022 | +75 | 3.00% to 3.25% |
| Nov. 2, 2022 | +75 | 3.75% to 4.00% |
| Dec. 14, 2022 | +50 | 4.25% to 4.50% |
| Feb. 1, 2023 | +25 | 4.5% to 4.75% |
| Mar. 22, 2023 | +25 | 4.75% to 5.00% |

64. As the Federal Reserve raised the Federal Funds Rate, the analyst community covering the solar industry closely monitored the rising interest rates and how they would impact

[10] Former employee 3 ("FE3") was an inside sales representative with the Company from May 2021 through April 2023.

[11] Taylor Tepper, "Federal Funds Rate History 1990 to 2025," Forbes (May 8, 2025). https://www.forbes.com/advisor/investing/fed-funds-rate-history/

the residential solar market, and more specifically when would the residential solar market pivot from loans to leases. The answer, according to Bank of America Securities analysts, was "swiftly." BofA analysts reported on January 31, 2023, that they saw a range of loan providers "rapidly shift[ing] alongside sales channels." BofA analysts then warned to "[e]xpect a moderated impact for the resi solar names, with the greatest risk for those catering most directly to the 'long-tail' of independent installers."

65. Keenly aware of this macroeconomic backdrop, Defendants, prior to and during the Class Period, repeatedly assured investors that fluctuating interest rates, which drive the solar market to favor leasing options, would ***not*** negatively impact Enphase's business.

66. On October 25, 2022, during the 3Q22 earnings call, when asked about the potential impact of higher financing costs on Enphase installers, Kothandaraman replied "we haven't seen any slowdown in demand. Our backlog remains strong. ***Our Q1 bookings remain healthy***."

67. On February 7, 2023, during the 4Q22 Earnings Call, Kothandaraman noted "see[ing] some analyst reports about ***a possible shift from loans to PPA due to the high prevailing interest rates***." He then reassured investors that Enphase's "installer base is very diverse, both small and large installers that offer cash, loans, and PPA options to homeowners. ***Any shift from one type of financing to another only has a minor impact to our business, almost negligible***."

68. Market analysts covering the Company echoed Kothandaraman's assurance that Enphase would not be impacted by a possible shift from loans to leases (or PPAs). For example, on February 7, 2023, Cowen reported that "[m]anagement noted it expects no material impact from a potential customer shift from loans to leases." The next day, analysts at BMO Capital Markets came away from the Company's 4Q22 Earnings Call "incrementally positive," despite growing negative sentiment in the face of a potential slow-down in the U.S. residential solar and Enphase's "exposure to long-tail installers." BMO's report noted that while Enphase "acknowledged signs of softening U.S. demand . . . the company sees little impact from a shift towards leases/PPAs away from loans."

### D. Defendants Shocked Investors By Revealing On April 25, 2023 That (1) Enphase *Did* Experience Pull Forward In Early 1Q23 Ahead Of NEM 2.0 Grandfathering Deadline, and (2) Interest Rates Materially Hurt Enphase's Demand/Sales – Leading To Disappointing 2Q23 Guidance

69. After beating consensus estimates and raising market expectations for numerous consecutive quarters, on April 25, 2023, after market close, the Company announced its 1Q 2023 financial results and provided guidance for 2Q 2023. While Enphase's 1Q 2023 quarterly revenue was at the midpoint of guidance, investors were shocked by the Company's flat ($700-750 million) top line guide for 2Q 2023—4% below consensus.

70. During the accompanying quarterly earnings call held that same day, in discussing Enphase's 1Q 2023 financial results and 2Q 2023 guidance ("1Q23 Earnings Call"), Kothandaraman told investors that U.S. revenue decreased 9% sequentially and sell-through of microinverters decreased 21% sequentially compared to 4Q23, which was worse than the normal seasonality decline of 15%. Kothandaraman noted that sell-through of microinverters in California was only 9% lower than 4Q 2023, but that sell-through of batteries in California was 23% lower than 4Q23, and that Enphase expected the difficult conditions in California with respect to battery sales to continue for the next 3 to 4 months:

> ***In the U.S., our revenue decreased 9% sequentially due to seasonality and macroeconomic conditions*** and increased 28% year-on-year. ***The sell-through of our microinverters in Q1 decreased 21% sequentially compared to Q4, worse than the typical seasonality of 15%***. . . .
>
> ***Our sell-through in California was only 9% lesser than Q4***. There was some impact due to the weather in early Q1, but the NEM 2.0 rush in Q1 more than compensated for it.
>
> ***California installers took advantage of the NEM 2.0 rush and have built up a solar backlog for the next 3 to 4 months***. We believe the installers aren't expanding their crews to accelerate installation, they're laser focused on their cash flow due to the high interest rate environment and are looking clarity -- for -- yes, clarity on the NEM 3.0 demand.
>
> ***Sell-through of our batteries in California was 23% lesser in Q1 compared to Q4 as installers focused mainly on solar. We expect this trend to continue for the next 3 to 4 months***.

71. With respect to the rest of the U.S., Kothandaraman explained that conditions were even worse due to increased interest rates:

> We observed that the sell-through was even lower in states with low utility rates, such as Texas, Florida and Arizona. ***In these states, the economics of loan financing has worsened due to rising interest rates***. The sell-through performance in the Northeast U.S. was a little better. ***Coming to IQ batteries, the sell-through in non-California states was 28% lesser in Q1 compared to Q4***.

72. Kothandaraman then further explained "some trends in financing:"

> Our Q1 data shows higher sell-through rates for long tail installers compared to Tier 1 and 2 installers. Our installers, in general, are navigating 3 key challenges: first, the rapid increase in interest rates over last year; second is switch from selling low APR with high dealer fees, the selling market rate loans with low dealer fees; and third, the delayed payment from the loan originators or as the industry calls it reduction of M1 payments.
>
> * * *
>
> ***We are also seeing new lease providers entering the market with focus on servicing the long tail***. We think capital will be available for both long-tail -- for long-tail installers regardless of the mix of loan and lease. On the reduced M1 payments, loan originators are providing less cash to installers at the time of contract signing and a greater percentage after installation.
>
> This creates a working capital challenge for the installers and is forcing them to become more efficient. As the installers adjust to this new reality, we expect the sell-through of microinverters and batteries to incrementally improve in Q2 compared to Q1.

73. When an analyst from Morgan Stanley sought clarification "around the health of the customer base, specifically the long tail," Kothandaraman responded, in part, that "***[l]eases to long-tail installers hasn't been ramped until now***, but that's an opportunity that we see already a few players come in. So I think it's going to be interesting to watch the situation in the next few quarters."

74. An analyst from Bank of America how to square dealing with "origination on NEM 2.0…against this temporary impact on installations." And more specifically, the analyst asked "[h]ow much of a non-California improvement are you guys thinking about, especially in the back half of the year as NEM 3.0 kind of rolls in more meaningfully?" In response, Kothandaraman admitted "[t]hat is going to be stress on those numbers because interest rates were high, but there are ***going to be some innovation in financing, innovation in loans, innovation in leases that are going to come. It's going to provide more access to our long-tail installers***." He then elaborated

"[t]he ***demand will unleash only when the interest rates are back to normal***. But until then, it will get incrementally better compared to Q1."

75. The Bank of America analyst continued pushing for more clarity: "But when you said temporary here and demand being down, just to clarify that super quickly, I know you only guide one quarter forward. I'm just trying to understand how temporary." Kothandaraman responded:

> What we said is in California, the point of sales, which is sellthrough data then show as much decline because ***in California, the installers have their hands full with NEM 2.0 installations for the next 3 to 4 months***. And now in this time, which is when the originations are happening for NEM 3.0, this is the time where we are working with those installers and helping them understand and pitch the value of NEM 3.0 to homeowners. So that's in California.
>
> ***Outside California, the situation is purely dominated by high interest rate environment***. …But like what I told you***, the demand will get unleashed to its original levels when the interest rates come back to normal***. But until then, we expect the sell-through in non-California states to incrementally improve as installers get used to the situation. That's what we said.

76. On this news, the Company's share price fell $56.77, or 25.73%, to close at $163.83 per share on April 26, 2023, on unusually heavy trading volume, with a corresponding market cap drop of $7.78 billion, or 25.73%, to close at $22.45 billion.

**E. Analysts' Reactions To The April 25, 2023 Disclosures Confirm That Defendants Misled The Market About (1) Enphase's Pull-Forward Sales Pattern In California; And (2) Enphase's Vulnerability To Rising Interest Rates**

77. In the days following the Company's announcement of disappointing quarterly performance for 1Q 2023 and, more importantly, weak outlook for 2Q 2023, analyst coverage confirmed that, contrary to Defendants' reassurances, Enphase had already seen the much anticipated "pull forward" in California ahead of the NEM 2.0 grandfathering deadline and that Enphase's U.S. demand, outside California, was vulnerable to rising interest rates because of the Company reliance on loan-heavy installers.

78. In their April 26, 2023 report, Barclays analysts, while noting there would be "much scrutiny into where the 2Q guide would shake out for ENPH," concluded that "[i]nvestors will be disappointed with 2Q guide" because "investors generally interpreted the better-than-expected pull forward commentary we got from channel checks over the last several weeks to materialize in a 2Q

number that would be more notably up on a q/q basis" but "**due to robust shipments ENPH made into year-end in 2022** . . . 2Q is roughly flat over 1Q." Barclays analysts also noted that "**[t]his would be in line with our view that we expect sequential declines for US shipments for the rest of the year, which we think runs counter to some investor expectations**." (Emphasis in original).

79. In a report dated April 26, 2023, analysts from Guggenheim Securities reported the Company's weak 2Q 2023 outlook, was "more significantly below our expectations" and attributed this to, in part, "California NEM 2.0 pull-forward demand fail[ing] to compensate for weakness elsewhere in the US." Guggenheim analysts also noted that it was "possible that the rest of the US does not see growth in Q2" because "more expensive financing and lower utility power prices in some markets, notably Texas and Florida, are impacting demand."

80. Deutsche Bank analysts, in their report on April 26, 2023, also took note of ENPH's "[d]isappointing 2Q guide with flat revenues driving stock weakness" "despite management expecting better seasonality in 2Q vs 1Q" and "3 to 4 months backlog in California exiting 1Q due to NEM 3.0 ***and a strong push observed in 1Q***."

81. On April 26, 2023, Bank of America Securities analysts downgraded Enphase's stock to Underperform "[g]iven a collapse in confidence in ENPH's ability to consistently raise expectations[.]" They also "stress[ed] that while these sound like small misses, ENPH has consistently beat and raised for five consecutive quarters …We had thought worst was behind us: we were wrong." In elaborating on why "perceived 'temporary' challenges likely worse before better," BofA analysts elaborated that "headwinds to near term growth are bolstered by weak sell through trends in the distributor channel and ***inflexible cash advance terms to installers***, which leave ongoing challenges throughout 2023. These sit atop ***interest rate driven challenges on US solar origination that ENPH cannot avoid, given its dominant market share to loan-heavy contractors***." (Emphasis added).

82. Analysts at Janney Montgomery Scott highlighted the shifting domestic market conditions, categorizing financing as a "headwind" for Enphase. The April 26, 2023 report then elaborated on their reasoning:

> With respect to its long-tail installer base, ENPH noted that it is aware of distributor/installer liquidity concerns and potential impacts to orders. Additionally, ***ENPH talked about the potential for creative financing solutions, including lease financing opportunities, for long-tail installers to help generate demand in 2H23***.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

83. On February 7, 2023, Defendants issued a press release announcing the Company's financial results for the fourth quarter ended December 31, 2022. That same day, the Company held a conference call in connection with the 4Q 2022 financial results (the "4Q22 Earnings Call").

84. During the 4Q 2022 Earnings Call, when asked about the impact of NEM 3.0, and more specifically whether Defendants had seen any potential pull forward on demand, Defendant Kothandaraman responded in the negative:

> Analyst: Kudos on the solid execution. First question I had was just around NEM 3.0. I think there's different implications of that policy uncertainty near term and medium term from what we're hearing. So maybe just wanted to get your thoughts near term, some views out there that maybe there's a pull forward on demand in California. Would be curious what you're seeing with respect to that? And then kind of in the medium term, we're hearing the industry is still maybe trying to figure out how to navigate this. So curious how you specifically are thinking about the second half of 2023 in the U.S.? Are you kind of base case in California to be down significantly?
>
> * * *
>
> Kothandaraman: Yes. ***On NEM 3, we aren't really seeing any pull forward right now***. But in talks with few installers in California, both big and small, like what I said, ***the originations are up strongly***. They are all quite optimistic. And maybe we will see something soon that's why I talked about an optimistic Q2. But ***so far, we haven't seen any pull forward demand yet***.

85. The statements identified in paragraph 84 were materially false and/or misleading and/or omitted material facts necessary to prevent them from being misleading because Defendants failed to disclose that the Company had experienced a pull forward of demand in December 2022 and January 2023, followed by a significant drop off in sales in late January 2023 and early February 2023.

86. On the topic of rising interest rates leading to a possible shift from loan financing to leasing of solar systems in the U.S., Defendant Kothandaraman in his prepared remarks stated:

> We've also seen some analyst reports about a possible shift from loans to PPA due to the high prevailing interest rates. We work with thousands of installers every quarter. ***Our installer base is very diverse, both small and large installers that offer cash, loans and PPA options to homeowners***. ***Any shift from one type of financing to another only has a minor impact to our business, almost negligible. No matter what the conditions are, our approach at Enphase does not change***.

87. The statements identified in paragraph 86 were materially false and/or misleading and/or omitted material facts necessary to prevent them from being misleading because the Company's installer base was not as diverse as Defendants represented and was weighted toward loan-heavy installers that principally offered loan financing rather than leasing options. Therefore, a shift toward leasing and/or PPA agreements due to high interest rates threatened a material adverse impact to Enphase's business rather than a "minor" or "negligible" impact.

## VII. LOSS CAUSATION

88. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

89. Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of Enphase securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Lead Plaintiff and the other members of the Class would not have purchased Enphase securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed risks materialized, the price of Enphase shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of Enphase securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic losses, *i.e.*, damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negate any inference that the economic losses and damages suffered by Lead Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

90. As detailed in ¶¶69-75, *supra*, the truths regarding (1) Enphase's pull forward sales pattern in California and (2) the financing patterns of Enphase's installer base and the concomitant exposure of its customer base to the risk of increasing interest rates were revealed, and/or the concealed risks materialized, on or about April 25, 2023.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

91. As alleged herein, Defendants acted with scienter because Defendants knew, or were deliberately reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

92. The Company is liable for the acts of Individual Defendant and its other employees and agents under the doctrine of respondeat superior and common law principles of agency, including, for example, statements made during earnings calls discussing the Company, because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

93. The scienter of Individual Defendant and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, respondeat superior, and agency principles.

94. Prior to and during the Class Period, Defendants and industry observers were closely monitoring the transition from NEM 2.0 to NEM 3.0 in California and trying to discern the timing of a "pull forward" in demand as consumers attempted to avail themselves of the grandfathering provisions of the new regime so that they could lock in the benefits of NEM 2.0 before a complete transition. In February 2022, shortly after the CPUC issued its initial proposed decision concerning NEM 3.0 (and about a year before the Class Period started), an analyst asked Defendants whether they anticipated "any pull-forward demand from NEM 3.0 uncertainty in California" and whether that was something Defendants expected "in the next couple of months." *See* ¶50, *supra*. Kothandaraman responded that he had not seen any pull through thus far and noted that the vote on

the proposed decision had been delayed. *See Id.*, *supra*. Another analyst asked a follow-up question about "the potential pull forward that could manifest once you get clarity on that policy." *See* ¶51, *supra*. Enphase's Chief Products Officer responded, "if NEM 3 holds in its current form, which is -- may not be likely, demand pull-through is likely to happen end of the year or even sometime early next year." *See Id.*, *supra*.

95. Once the final CPUC decision on NEM 3.0 was issued on December 15, 2022, multiple analysts covering the solar industry stated that they expected a material pull forward in demand as NEM 2.0 was phased out and gave way to less favorable terms under NEM 3.0. According to a December 16, 2022 report by Deutsche Bank Research, "***We likely will see an unusual seasonality pattern in California going into 2023, with an acceleration of installations in 1Q through mid-April 2023, as customers will attempt to take advantage[] of the grandfathering clause. This will be followed by a slowdown in demand once NEM 3.0 is implemented*** . . . ." *See* ¶40, *supra*. Similarly, a January 31, 2023 report by Bank of America Securities stated: "***[W]hat appears to us to be intriguing is sales inquiries in California remain up suggesting early indications of the 'rush' ahead of NEM 3.0 deadline***." *See* ¶41, *supra*.

96. Thus, both Enphase and the larger solar industry and investors were closely watching for signals of this "unusual seasonality pattern" in California in which orders and installations were expected to rapidly accelerate and then be followed by a slowdown. It is for this reason that Defendants were asked again about a demand pull forward on 4Q22 Earnings Call on February 7, 2023. *See* ¶58, *supra*.

97. While Kothandaraman insisted during the 4Q22 call that "***so far, we haven't seen any pull-forward demand yet***," that is precisely what Defendants had observed: robust sales during the first 30-45 days following the adoption of NEM 3.0 (*i.e.*, from December 15, 2022 to mid-late January 2023) followed by a severe slowdown in sales (*i.e.*, from mid-late January 2023 to early February 2023). Even if Kothandaraman thought that sales might pick up again between February and April, it was at the very least deliberately reckless to deny seeing any signs of a pull forward at the time when that is the exact pattern that had thus far presented itself to Defendants.

98. In addition to Defendants' monitoring of Enphase's sales and seasonality pattern in California, more broadly, Defendants stated that they were closely monitoring their channel inventory and demand patterns throughout the country. For example, during Enphase's 2Q 2022 earnings call on July 26, 2022, Kothandaraman stated:

> [W]e are typically conservative in our guidance. We like to make sure that one of the things we look at is ***we look at channel, we look at inventory, we are hawks at monitoring that***. We're extremely disciplined. So we gave ourselves a slightly wider range at this time. But like what I said, we are incredibly bullish about our business. We -- the installers love using our product. ***We meet with 10 to 15 installers every week***. We take down all of the issues that they have and all of the things that Enphase needs to do in order to make sure their life becomes easier. We take those actions. We go execute them.

99. The analyst community covering Enphase, and the solar industry more generally, closely monitored the rising interest rates and as Bank of American Securities analysts noted in their January 31, 2023, as the residential solar market pivoted from loans to leases, those companies catering most directly to the "long-tail" installers, like Enphase, had the "greatest risk."

100. About a week later during the 4Q22 Earnings Call on February 7, 2023, Kothandaraman admitted Defendants were (1) monitoring analyst commentary on the rising interest rates causing a shift from loans to leases in the residential solar market; and (2) paying particularly close attention to whether consumers were shifting from their behavior due to rising interest rates. Kothandaraman stated:

> We've also seen some analyst reports about ***a possible shift from loans to PPA due to the high prevailing interest rates***. We work with thousands of installers every quarter. Our installer base is very diverse, both small and large installers that offer cash, loans, and PPA options to homeowners. ***Any shift from one type of financing to another only has a minor impact to our business, almost negligible***.

101. Thus, Defendants claimed that they were closely watching their consumers' demand and purchase patterns and Enphase's channel inventory and installer feedback throughout the United States, and Defendants were in fact closely monitoring these areas of Enphase's performance. The transition from NEM 2.0 to NEM 3.0 in California and the financing behavior of Enphase's customers and installers were both core operations of the Company, and Defendants may therefore

be presumed to have had access to, and to have reviewed, information about Enphase's sales trends, number of bookings, the amount of channel inventory, and the financing patterns of its customers.

102. Additionally, when the truth was revealed on April 25, 2023, Kothandaraman admitted that "[l]eases to long-tail installers [hadn't] been ramped up ***until now,*** but that's an opportunity that we see already ***a few players*** come in." In response to an analyst question, Kothandaraman further admitted to "stress on [non-California] numbers because interest rates were high, but there ***are going to be some innovation in financing, innovation in loans, innovation in leases that are going to come. It's going to provide more access to our long-tail installers***." These admissions make clear that contrary to Defendants' February 7, 2023 representation that Enphase's installer base was "very diverse" and "[a]ny shift from one type of financing to another only has a minor impact to our business, almost negligible, " Enphase's long-tail heavy installer base had only just started to pivot in response to the increasing interest rates.

103. Bank of America Securities analysts in a report dated April 26, 2023 discussed Enphase's challenges noting "headwinds to near term growth are bolstered by weak sell through trends in the distributor channel and inflexible cash advance terms to installers, which leave ongoing challenges throughout 2023. These sit atop interest rate driven challenges on US solar origination that ENPH cannot avoid, given ***its dominant market share to loan-heavy contractors***."

## IX. CLASS ACTION ALLEGATIONS

104. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Enphase securities between February 7, 2023 and April 25, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

105. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Enphase's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be

ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Enphase shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Enphase or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

108. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Enphase; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

109. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**X. APPLICABILITY OF PRESUMPTION OF RELIANCE**

110. The market for Enphase's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Enphase's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Enphase's securities and market information relating to Enphase, and have been damaged thereby

111. During the Class Period, the artificial inflation of Enphase's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Enphase's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Enphase and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

112. At all relevant times, the market for Enphase's securities was an efficient market for the following reasons, among others:

(a) Enphase shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Enphase filed periodic public reports with the SEC and/or the NASDAQ;

(c) Enphase regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Enphase was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

113. As a result of the foregoing, the market for Enphase's securities promptly digested current information regarding Enphase from all publicly available sources and reflected such information in Enphase's share price. Under these circumstances, all purchasers of Enphase's securities during the Class Period suffered similar injury through their purchase of Enphase's securities at artificially inflated prices and a presumption of reliance applies.

114. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

115. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements

pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Enphase who knew that the statement was false when made.

## XII. CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

116. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

117. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Enphase's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

118. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Enphase's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

119. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Enphase's financial well-being and prospects, as specified herein.

120. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Enphase's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Enphase and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

121. Individual Defendant's primary liability and controlling person liability arises from the following facts: (i) Individual Defendant was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Individual Defendant enjoyed significant personal contact and familiarity with other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each Defendant was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

122. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Enphase's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

123. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Enphase's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Enphase's securities during the Class Period at artificially high prices and were damaged thereby.

124. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Enphase was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Enphase securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

125. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

126. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**<u>SECOND CLAIM</u>**

**Violation of Section 20(a) of The Exchange Act**
**Against Individual Defendant**

127. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

128. Individual Defendant acted as a controlling person of Enphase within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements disseminated to the investing public, Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

129. In particular, Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

130. As set forth above, Enphase and Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial jury.

DATED: May 21, 2025

GLANCY PRONGAY & MURRAY LLP

By: */s/ Charles H. Linehan*

Charles H. Linehan
Melissa C. Wright
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: clinehan@glancylaw.com
Email: mwright@glancylaw.com

*Attorney for Lead Plaintiff Lon D. Praytor and Lead Counsel for the Putative Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On May 21, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 21, 2025, at Los Angeles, California.

*/s/ Charles H. Linehan*
Charles H. Linehan