CHARLES H. LINEHAN (#307439)
  clinehan@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorney for Lead Plaintiff Lon D. Praytor
and Lead Counsel for the Putative Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WAYNE HAYES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENPHASE ENERGY, INC., BADRINARAYANAN KOTHANDARAMAN and MANDY YANG,<br><br>Defendants. | Case No. 3:24-cv-04249-JD<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:      November 6, 2025<br>Time:     10:00 am<br>Crtrm.:   11, 19th Floor<br><br>Judge:    James Donato |

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 3:24-cv-04249-JD

# TABLE OF CONTENTS

GLOSSARY OF DEFINED TERMS ............................................................................................... v

STATEMENT OF ISSUES TO BE DECIDED .............................................................................. vi

I.    PRELIMINARY STATEMENT ........................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................................... 1

    A.    Interest Rates In The United States................................................................................ 1

    B.    NEM 3.0 In California ................................................................................................... 2

    C.    The Truth Is Revealed................................................................................................... 3

III.  THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS................................... 3

    A.    The Installer Financing Statement Was Materially Misleading ........................................ 4

    B.    The Pull Forward Statement Was Materially Misleading.................................................. 7

IV.   THE COMPLAINT ALLEGES SCIENTER........................................................................ 10

    A.    The April 2023 CEO Admissions Show Enphase's Installer Base Was Not As Diverse As Defendants Represented During The Class Period ....................................... 10

    B.    The Core Operations Doctrine Supports A Strong Inference Of Scienter........................ 11

    C.    Defendants' Monitoring Statements Support An Inference of Scienter ........................... 12

    D.    Temporal Proximity Of Misstatements To Corrective Disclosure Supports Scienter ...................................................................................................................... 13

    E.    Absence Of Financial Motive Allegations Does Not Undermine Scienter ...................... 13

V.    THE COMPLAINT ALLEGES LOSS CAUSATION............................................................ 14

VI.   CONCLUSION............................................................................................................... 15

## TABLE OF AUTHORITIES

CASES

*Baker v. SeaWorld Entm't, Inc.*,
  423 F. Supp. 3d 878 (S.D. Cal. 2019).................................................................................................. 15

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ................................................................................................................. 3

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ................................................................................................................ 13

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ............................................................................................................ 15

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ................................................................................................................. 4

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ......................................................................................................... 4, 6, 9

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ............................................................................................................... 3, 4

*In re Amgen, Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal Aug. 4, 2014)...................................................................................... 10

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...................................................................................... 13

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017).................................................................................................... 6

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ........................................................................................... 7

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) .............................................................................................................. 14

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ......................................................................................................... 9, 10

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ................................................................................................................. 3

*In re Gilead Sci. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................................................ 14

*In re OmniVision Techs., Inc. Sec. Litig.*,
    937 F. Supp. 2d 1090 (N.D. Cal. 2013) ................................................................ 12

*In re Portal Software, Inc. Sec. Litig.*,
    2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ........................................................ 6

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ............................................................ 6, 7, 10

*In re Zillow Grp., Inc. Sec. Litig.*,
    2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ................................................... 13

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) .................................................................... 11

*Kendall v. Odonate Therapeutics, Inc.*,
    2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ........................................................ 9

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ............................................................... 14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ............................................................ 14, 15

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................. 10

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) ............................................................... 14

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ................................................................ 10

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................ 10, 11, 12, 13

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ................................................................. 3

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................ 13

*Smilovits v. First Solar Inc.*,
    119 F. Supp. 3d 978 (D. Ariz. 2015) .......................................................... 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................... 10, 13

*Thant v. Rain Oncology Inc.*,
  2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ........................................................................ 15

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
  2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ............................................................................ 13

STATUTES

15 U.S.C. §78u-5(c)(1) ................................................................................................................ 6

## GLOSSARY OF DEFINED TERMS

| TERM | DESCRIPTION |
|---|---|
| CEO | Chief Executive Officer |
| Class Period | February 7, 2023 through and including April 25, 2023 |
| Complaint | Corrected Amended Class Action Complaint For Violations Of The Federal Securities Laws (ECF 78, cited herein at "¶__")) |
| CPUC | California Public Utility Commission |
| Defendants | Enphase and Badrinarayanan Kothandaraman |
| Enphase or the Company | Enphase Energy, Inc. |
| Exchange Act | Securities Exchange Act of 1934 |
| FE1 | Former Employee 1 |
| FE2 | Former Employee 2 |
| FE3 | Former Employee 3 |
| Kothandaraman or CEO | Defendant Badrinarayanan Kothandaraman (Enphase's CEO) |
| Linehan Decl. | Declaration Of Charles Linehan In Support Of Lead Plaintiff's Opposition To Defendants' Motion To Dismiss, filed concurrently herewith. |
| NEM | Net Energy Metering |
| Pl. RJN | Lead Plaintiff's Request For Judicial Notice In Support Of Lead Plaintiff's Opposition To Defendants' Motion To Dismiss, filed concurrently herewith. |
| Plaintiff | Lead Plaintiff Lon D. Praytor |

**STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

Plaintiff agrees with and incorporates by reference Defendants' statement of issues to be decided. *See* MTD i.

## I.    PRELIMINARY STATEMENT

This securities fraud class action alleges violations of Sections 10(b) and 20(a) of the Exchange Act against Enphase and its CEO Badrinarayanan Kothandaraman.[1] During the Class Period, Defendants (1) touted the diversity of financing options offered by Enphase's installer base which, Defendants claimed, protected Enphase from a shift in consumer financing behavior due to high interest rates, and (2) assured investors that Enphase had not yet experienced any "pull forward" of demand in California following the adoption of NEM 3.0. Both of these claims were materially false and misleading. When the truth was revealed and the concealed risks materialized one quarter later, Enphase's stock price dropped more than 25%, wiping out billions of dollars in market capitalization and harming investors.

## II.    STATEMENT OF FACTS

Enphase manufactures and sells solar energy systems—microinverters (solar panels), batteries, and EV chargers. ¶22. Nearly all of Enphase's 2022 revenue came from residential microinverter sales, and more than 75% of its 2022 revenue came from the U.S. ¶¶23, 30. Historically, solar customers would lease home solar systems rather than buy them due to the high cost ($18,000 – $22,000). ¶26. Leasing was historically dominated by larger Tier 1 installers, but as the availability of loan financing increased between 2014 and 2022, lower-tier or "long-tail" installers began to enter the market. ¶¶27 n.3, 28. Enphase primarily served long-tail installers, who due to their smaller size, typically tended to have customers either paying cash or financing with a loan, rather than leasing. ¶¶27 n.3, 29. But during the Class Period, the Company claimed to have a "diverse" installer base that included leasing. ¶¶9, 100.

### A.    Interest Rates In The United States

Starting in March 2022, interest rates in the U.S. began to increase significantly. ¶63. In a January 31, 2023 report, analysts noted that in response to the rising interest rates, the residential solar market was "swiftly" pivoting from loan financing to leasing, which could harm certain solar companies, "with the greatest risk for those catering most directly to the long-tail of independent installers." ¶64.

Just one week later, during Enphase's 4Q22 earnings call on February 7, 2023, Kothandaraman addressed "some analyst reports about a possible shift from loans to PPA [leases] due to the high

---

[1] Capitalized terms are defined in the Glossary. Unless otherwise indicated, all emphasis is added and citations are "cleaned up." The Class Period is from February 7, 2023 to April 25, 2023. ¶1.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 3:24-cv-04249-JD                                                      1

prevailing interest rates." ¶67. He responded by reassuring investors that Enphase's "installer base is very diverse," with "both small and large installers that offer cash, loans, and PPA [lease] options to homeowners" such that "[a]ny shift from one type of financing to another only has a minor impact to our business, ***almost negligible***." *Id*. This assurance was accepted and repeated by multiple analysts, with one coming away "incrementally positive" notwithstanding Enphase's "exposure to long-tail installers." ¶68.

## B.    NEM 3.0 In California

NEM (net energy metering) policies allow residential solar customers to sell excess generated power back into a state's grid. ¶33. In December 2021, California's CPUC issued proposed revisions to the state's NEM 2.0 policy substantially lowering residential solar customers' compensation for selling power to the grid. ¶34. Following a public outcry, the CPUC delayed a vote on the revisions and per a court order, the record was reopened to further consider certain aspects of the proposal. ¶36.

Throughout the year-long period between the CPUC's initial December 2021 decision and the CPUC's final NEM 3.0 decision in December 2022, both Enphase and securities analysts covering the Company closely monitored NEM 3.0 developments. ¶¶48-55. In February 2022, Enphase publicly criticized the proposed decision as "unfairly penaliz[ing] solar-only systems" and promised it was "working diligently" to "influence a better outcome." ¶¶48, 49; *see also* ¶¶53, 54, 55 (similar NEM 3.0 updates on April 26, July 26, and October 26, 2022). During that February 2022 call, Defendants addressed analyst questions about whether there were any indications of a pull forward of demand due to the NEM 3.0 uncertainty in California. ¶¶50-51. Defendants told investors that they were not currently seeing any pull forward of demand and if there was any, it would likely happen at the end of 2022 or early 2023. *Id.*

On December 15, 2022, the CPUC approved a revised proposed decision on NEM 3.0, which allowed existing solar customers to maintain their NEM 2.0 rates for 20 years from date of grid connection. ¶38. In addition, ***new*** solar customers could still obtain NEM 2.0 rates if they applied for grid connection by April 14, 2023 and connected by April 15, 2026. *Id.*

The Class Period starts on February 7, 2023, when Enphase held its 4Q22 earnings call following the final decision on NEM 3.0. ¶57. During that call, an analyst again questioned whether Enphase had seen a pull forward on demand in California, to which the CEO responded "[o]n NEM 3.0, we aren't really seeing any pull forward right now." ¶58. This representation was echoed by several analysts. ¶59.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 3:24-cv-04249-JD

But unbeknownst to investors, a pull-forward in demand is precisely what had occurred. According to FE2, following initial solid results, "30-45 days in NEM 3.0" Enphase's sales became "crappy." ¶60. In short, Enphase experienced strong sales during late December 2022 and early January 2023, and by February 7, 2023, Enphase had already experienced somewhere between one to three weeks of "crappy" sales as the rush to take advantage of the grandfathering provisions for NEM 2.0 dried up. ¶61.

### C. The Truth Is Revealed

After hours on April 25, 2023, Enphase—after beating consensus estimates and raising market expectations for numerous consecutive quarters—shocked investors with flat top-line guide for 2Q23 that was 4% below consensus. ¶69. During the earnings call held the same day, Kothandaraman detailed worsening sell-through rates due to increased interest rates hindering loan financing. ¶71. And in response to analyst inquiry about "the health of the customer base, specifically the long tail," he revealed that "*[l]eases to long-tail installers hasn't been ramped until now*." ¶73. When an analyst pushed for more clarity, the CEO told investors that "in California, installers have their hands full with NEM 2.0 installation for the next 3 to 4 months.... Outside California, the situation is purely dominated by high interest rate environment" and "the demand will get unleashed to its original levels when the interest rates comes back to normal." ¶75. On this news, Enphase's share price fell $56.77 (25.73%), to close at $163.83 on April 26, 2023, on unusually heavy trading volume, with a corresponding market cap drop of *$7.78 billion*. ¶76.

## III.  THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS

"[S]tatements and omissions are actionably false or misleading if they directly contradict what the defendant knew at that time, or create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023). A "statement that is literally true can be misleading and thus actionable." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Although the law does not create a duty to disclose all material information, once issuers "choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

Whether an omission is material "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him." *In re*

*Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021). "These assessments are peculiarly ones for the trier of fact." *Id.* The same is true as to whether a statement is misleading. *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* While scienter is subject to a "strong inference" standard, the pleading of falsity is subject to a plausibility standard. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("we do not impute the strong inference standard of scienter to the element of falsity. . . Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility").

### A.    The Installer Financing Statement Was Materially Misleading

During the 4Q22 call, Kothandaraman, in his prepared remarks, addressed concerns raised in analyst reports that rising interest rates might cause a shift in financing for residential customers from loans to leasing. He responded to these concerns by assuring investors that Enphase's installer base was "very diverse" and that its installers offered a variety of financing options, so a shift from one form of financing to another would have only a "minor" and "almost negligible" impact on Enphase's business:

> We've also seen some analyst reports about a possible shift from loans to PPA due to the high prevailing interest rates. We work with thousands of installers every quarter. ***Our installer base is very diverse, both small and large installers that offer cash, loans and PPA options to homeowners. Any shift from one type of financing to another only has a minor impact to our business, almost negligible. No matter what the conditions are, our approach at Enphase does not change***.

¶86 (emphasis added).

This response was misleading because it failed to disclose that Enphase's installer base was heavily weighted toward long-tail installers, who principally serviced customers utilizing solar loans and were not prepared for a shift to leasing in a high interest rate environment. ¶87. Indeed, the CEO on April 25, 2023 admitted to these facts during the 1Q23 earnings call , acknowledging that "[l]eases to long-tail installers ***hasn't been ramped until now***." ¶73. He also admitted that while he expected "some innovation in financing" (¶74) to address this problem, those new solutions had yet to be developed and were "***going to come***" (¶74) at some unidentified point in the future once installers got "***used to the situation***." ¶75. He also acknowledged that "[t]he demand will unleash only when the interest rates are back to normal." ¶74.

Following these disclosures, analysts reported that Enphase was particularly exposed to this financing problem because of its "***dominant market share to loan-heavy contractors***." ¶81. Thus, while

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 3:24-cv-04249-JD

4

Kothandaraman had assured the market that Enphase's "very diverse" installer base offered all types of financing options, such that any shift in financing would only have a "minor," "almost negligible" impact, in reality Enphase's installer base principally consisted of "loan-heavy" long-tail installers who had not yet developed leasing options to offer customers in the high interest rate environment.

Defendants contend that the Complaint does not allege sufficient facts about the makeup of Enphase's installer base. MTD 10. But the Complaint does allege that Enphase's installer base was heavily weighted toward long-tail installers, ¶81, and the CEO *admitted* at the end of the Class Period that these installers were not prepared to offer leasing options to residential customers. ¶74. Those admissions were made just one quarter after assuring investors that Enphase's installers offered all forms of financing, including leases, to dispel concerns raised in analyst reports about the precise risk that came to materialize. ¶86. Moreover, Kothandaraman went out of his way to bring up these analyst reports to refute them, having raised the issue during his own prepared remarks, not in response to an off-the-cuff question. *Id.* Under these circumstances, reasonable investors would expect that the CEO had checked his facts before offering a broad assurance about the types of financing that Enphase's installers offered. This context anchors his statements about Enphase's installer base and suffices to plead falsity with particularity.

Defendants also argue that the Complaint fails to allege that there was more than a "minor" impact due to a shift in financing, noting that Enphase met its guidance for 4Q22 and 1Q23. MTD 10, 15. But the falsity of the CEO's statements does not depend on whether Enphase met its guidance. The question is whether his description of Enphase's installer base and the financing options offered by those installers was accurate based on the facts known at the time. And at the time of the challenged statements, the majority of Enphase's installers did not offer leases, exposing Enphase to the very risk the CEO tried to dismiss. Enphase also experienced a material impact in 1Q23, because even though it met its guidance for that quarter (aided by the NEM 3.0 pull forward), it offered very weak guidance for 2Q23, triggering a 25.7% decrease in Enphase's stock price. *See* Sec. V, *infra*. Moreover, the CEO admitted "[t]he demand will unleash only when the interest rates are back to normal" (¶74), thereby conceding the financing issues with Enphase's installers would have a long-term material adverse impact.

Defendants argue that Kothandaraman's statements were puffery, but the language he used is very different than in Defendants' cited cases. He described the potential impact of a shift in financing as not

only "minor" but "almost negligible," suggesting Enphase's exposure was almost zero. Moreover, in determining whether a statement is puffery, courts must consider the statement's context. Even general language that constitutes puffery in some contexts may be actionable in others. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("even general statements of optimism, **when taken in context**, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly"); *Forescout Techs.,*, 63 F.4th at 770-71(that "challenged statements were made in response to specific questions asked by financial analysts" was important part of statements' context cutting against finding of puffery).

Here, the CEO's description of Enphase's "very diverse" installer base was contextualized by his description of the financing options offered by those installers, such that any shift in financing would have an "almost negligible" impact on Enphase's business. His statement also was made in response to specific concerns by analysts about whether certain companies were particularly exposed to risk in the high interest rate environment due to their heavy reliance on long-tail installers. These particularized facts take the CEO's statements out of the realm of puffery.[2]

Finally, Defendants argue their statements are protected by the PSLRA safe harbor. But the statements included both forward-looking elements and statements of present fact, including that Enphase's installer base was "very diverse" and *currently* offering leasing options to their customers. These statements were materially misleading about the present state of affairs and thus not protected by the safe harbor. *See Quality Sys.*, 865 F.3d at 1142.

Even assuming the statements were forward-looking, they are not protected because they were not accompanied by "meaningful" cautionary language and Defendants had actual knowledge of facts that rendered the statements misleading. 15 U.S.C. §78u-5(c)(1). For cautionary language to be meaningful, it must "be precise and relate directly to the forward-looking statements at issue." *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005). For mixed statements, the caution "must accurately convey appropriate, meaningful information about not only the forward-looking

---

[2] *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (while certain statements could be "mere puffery when viewed in isolation, context shows they were made in an effort to reassure the investing public about the Company's integrity … during a time of concern" and "therefore a reasonable investor could rely on them as reflective of the true state of affairs").

statement but also the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1148. "If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be sufficiently meaningful to qualify the statement for the safe harbor." *Id.* at 1146-47.[3] Here, Defendants' cautionary language did not warn that the majority of Enphase's installers did not currently offer leasing options to customers and that Enphase was therefore particularly exposed to the risks of the high interest rate environment. And the Complaint's particularized allegations raise a strong inference that Defendants had actual knowledge of these facts. *See* Sec. IV, *infra*.

**B.      The Pull Forward Statement Was Materially Misleading**

During the 4Q22 earnings call on February 7, 2023, an analyst asked whether Enphase was seeing any pull forward of demand in California arising from the approval of NEM 3.0. The CEO stated that originations were "up strongly" but he denied seeing any indications of a pull forward of demand:

> ***On NEM 3, we aren't really seeing any pull forward right now***. But in talks with few installers in California, both big and small, like what I said, ***the originations are up strongly***. They are all quite optimistic. And maybe we will see something soon that's why I talked about an optimistic Q2. But ***so far, we haven't seen any pull forward demand yet***.

¶84 (emphasis added).

This statement was materially false and misleading because by the time of the statement (February 7, 2023), Defendants had already seen a pull forward—a brief period of strong sales after NEM 3.0 was approved on December 15, 2022, followed by a severe decline 30-45 days later. ¶¶60-61. According to FE2, "30-45 days into NEM 3.0, boom. It was like, 'Why are sales so crappy?'" ¶60. Thus, by the time of the February 7 statement, Enphase had already experienced a period of strong sales, followed by a sharp decline for a period of at least one to three weeks. These are the classic hallmarks of a pull forward.

Defendants argue Plaintiff's allegations are flawed, because even though "NEM 3.0 was finalized in mid-December 2022, ***it did not go into effect until April 15, 2023***." MTD 7. This argument fails for multiple reasons. First, the effective date of NEM 3.0 was December 15, 2022, the date the order was approved. According to the order approved by the CPUC, "***[t]his order is effective today. Dated December***

---

[3] *See also In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *8 (N.D. Cal. Jan. 6, 2022) (warnings not adequate because they were "not targeted or tailored to cautioning investors that [the challenged] statements were qualified, incomplete, untrue, or otherwise misleading").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 3:24-cv-04249-JD                                                                                                    7

*15, 2022*."[4] Thus, notwithstanding a grandfathering provision allowing new customers to apply for the old rate structure until April 14, 2023, NEM 3.0 went into effect on December 15, 2022. ¶¶37-38.

Second, Defendants acknowledge that 30-45 days after the grandfathering deadline "would extend beyond [FE2's] employment at Enphase, which ended in May 2023." MTD 7. Thus, it would make little sense for FE2 to have been referring to the grandfathering deadline, and the more plausible interpretation is that FE2 was referring to 30-45 days following the effective date of NEM 3.0, which fits within FE2's dates of employment.

Third, Plaintiff's interpretation is supported by Defendants' admissions. During Enphase's 1Q23 earnings call on April 25, 2023, the CEO stated the sell-through in California in 1Q23 was 9% lower than in 4Q22, but those results were buoyed somewhat by "*the NEM 2.0 rush in Q1*." ¶70. This is consistent with Plaintiff's timeline. In other words, Enphase experienced solid sales during the second half of December 2022 and the first few weeks of 2023 ("the NEM 2.0 rush"), but then experienced a sharp drop in sales in late January/early February. Under Defendants' timeline, however, the drop off in sales did not occur until 30-45 days after the grandfathering deadline, well into 2Q. That makes no sense, because if there was an "NEM 2.0 rush," it would have ended *before* the grandfathering deadline, not after it.

Defendants argue that they had "only limited and lagging visibility into consumer demand" and therefore would not have been able to discern the pull forward until well after it occurred. MTD 8. This argument, however, ignores the fact that Defendants (and, more broadly, the entire solar industry and analysts covering it) were keenly focused on NEM 3.0 and closely monitoring sales for any indication of a pull forward. Indeed, Defendants acknowledged that they were watching for signals of a pull forward as early as *February 2022*, after the vote on the initial proposed version of NEM 3.0 was delayed. ¶¶36, 50-51. And analyst reports following the approval of NEM 3.0 in December 2022 told investors to expect "an unusual seasonality pattern in California going into 2023, with an acceleration of installations in 1Q through mid-April 2023." ¶40; *see also* ¶41 (January 2023 analyst report observed "early indications of the rush ahead of NEM 3.0 deadline"). In any event, FE2 reported a sharp drop in *sales by Enphase*, not merely a projection by installers of weak sales going forward. Thus, even if Defendants only had lagging

---

[4] *See* Linehan Decl., Ex. A at 245 (CPUC decision adopted on December 15, 2022). This document is both judicially noticeable and incorporated by reference into the Complaint. *See* ¶37; Pl. RJN at 1-2.

visibility into future demand by consumers, a sharp drop in Enphase's sales by late January/early February was a strong indicator that the pull forward had already occurred.

Defendants argue that FE2 and the other FEs are not described with sufficient particularity for their accounts to be reliable. MTD 6-8. The Complaint, however, provides the job title and dates of employment for each FE, as well as other indicia of reliability. To determine whether a confidential witness is sufficiently reliable on a motion to dismiss, the Court must review the Complaint's allegations holistically and consider a number of factors, including "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005), *abrogated in part on other grounds as recognized by Forescout*, 63 F. 4th at 766.

FE2 was a senior technical sales consultant with Enphase from April 2021 through May 2023, ¶60 n.9, which put FE2 in a position to observe the run-up to the approval of NEM 3.0, the entirety of 1Q23 (the first full quarter following that approval), and a significant portion of 2Q23. FE2's allegations are also corroborated by FE3, who was an inside sales representative at Enphase from May 2021 through April 2023. ¶62 n.10. FE3 stated that NEM 3.0 "totally threw off" the California market, which was "major" for Enphase, and "a non-trivial percentage of earnings fell off due to NEM 3.0." ¶62. FE2 and FE3, therefore, cross-corroborate each other's accounts, lending additional credence to their allegations. *See Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *7 (S.D. Cal. Aug. 4, 2021) (crediting allegations from confidential sources because, *inter alia*, "their statements are cross-corroborating").

Defendants argue the Complaint does not specify whether any of the FEs were located in California. MTD 7. But these witnesses did not have to be located in California to observe the impact of NEM 3.0 on Enphase's sales in California, which was a major market for the Company. California made up about 40% of the total residential solar market in the U.S., and California was responsible for roughly 20% of Enphase's total revenues, not just in the U.S., but globally. ¶¶31-32. According to FE1, Enphase dedicated about 40% of its regional sales managers to California. ¶32. These facts support an inference that California sales and the impact of NEM 3.0 on those sales were topics of general importance at Enphase and that knowledge of California sales trends was not limited to California employees.

The FE allegations are also corroborated by Defendants' post-Class Period admissions. As discussed above, Defendants admitted that there was a material decline in sales in California during 1Q23 as compared to 4Q22, notwithstanding that sales were bolstered by the "NEM 2.0 rush." ¶70. This lends further credence to FE2's allegation that sales were initially solid following the approval of NEM 3.0 but then experienced a dramatic decline about 30-45 days later. *See Daou*, 411 F.3d at 1015 (courts should consider "the corroborative nature of the other facts alleged (including from other sources)").

## IV.    THE COMPLAINT ALLEGES SCIENTER

A complaint pleads scienter if "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). Scienter includes not only an "intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The scienter determination may be based principally or entirely on circumstantial evidence. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781, 785-86 (9th Cir. 2008). A strong inference exists if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Under this rule, "a tie goes to the Plaintiff." *In re Amgen, Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal Aug. 4, 2014).

### A.    The April 2023 CEO Admissions Show Enphase's Installer Base Was Not As Diverse As Defendants Represented During The Class Period

Scienter is alleged based on the CEO's admission on April 25, 2023 that "[l]eases to long-tail installers [hadn't] been ramped up *until now*." ¶¶73, 102.[5] This supports a strong inference that Defendants knew at all times prior to April 2023 that Enphase's installer base was *not* diverse enough to immunize Enphase's operations from a financing shift from loans to leases due to high prevailing interest rates. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter alleged where "defendants

---

[5] *See also* ¶72 (admitting Enphase's 1Q23 sell-through rates were higher for long-tail installers than Tier 1 and 2 installers, CEO noted "[w]e are also seeing *new* lease providers *entering the market* with focus on servicing the long tail"); ¶74 (CEO telling investors there "are going to be some innovation in financing .... to provide more access to our long-tail installers").

---

knew at all relevant times that the Company had serious inventory problems that they sought to disguise").

Even if Defendants hoped new lease providers would enter the market to service long-tail installers, Defendants' concealment of the present lack of financing diversity amongst Enphase's installer base supports scienter. In fact, assuming Defendants *did* have such a hope, that further bolsters scienter because "then 'the benefits of concealment might [have] exceed[ed] the costs'" of disclosure. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016).

**B.      The Core Operations Doctrine Supports A Strong Inference Of Scienter**

Defendants attempt to improperly narrow the core operations doctrine (MTD at 13), which can support or establish an inference of scienter in *three* ways. *S. Ferry*, 542 F.3d at 785.[6] First, allegations about a defendant's role in a company may be combined with other allegations and *together* give rise to the required inference. *Id.* "Second, such allegations may *independently* satisfy the PSLRA where they are particular and suggest that defendants had *actual access* to the disputed information." *Id.* at 786. Third, even without particularized allegations of actual access, core operations allegations may satisfy the PSLRA if "the nature of the relevant fact is of such prominence that it would be *absurd to suggest that management was without knowledge of the matter*." *Id.* Here, Plaintiff has pled scienter under two of the three tests.

Enphase's U.S. residential microinverter business is the core of Enphase's operations. ¶23 (83% of 2022 revenue came from residential microinverter sales); ¶30 (76% of 2022 revenue was generated in the U.S.). Prior to and during the Class Period, Defendants and the market closely monitored the potential impact on Enphase's core operations from both (i) California's transition to NEM 3.0 and (ii) any shift from loan financing to leases. *See, e.g.*, ¶50 (one year prior to the start of the Class Period, CEO confirming no pull forward in California demand in response to analyst inquiry), ¶¶53-55 (CEO's investor updates on a potential decision for California's NEM 3.0 on April 26, July 26, and October 26, 2022), ¶58 (on February 7, 2023, following the adoption of NEM 3.0 in December 2022, CEO misleadingly assuring the market that Enphase had not yet experienced any pull forward in demand in California, when it had), ¶59 (analysts repeating CEO's assurance that Enphase was not seeing any pull-forward on demand following

---

[6] Defendants suggest the only way to invoke the core operations doctrine is if the Complaint satisfies the third test (MTD 13), ignoring two other ways core operations allegations can support scienter.

NEM 3.0 adoption), ¶66 (responding to analyst inquiry on October 25, 2022 that Enphase had not seen any "slowdown in demand" despite higher financing costs for Enphase installers), ¶67 (responding to analysts reporting on a possible shift from loans to leases due to high prevailing interest rates with assurance that Enphase's business would not be impacted), ¶68 (analysts accepting and repeating CEO's assurance that Enphase's business would not be materially impacted from a shift from loans to leases).

These facts show Defendants and investors considered California's transition to NEM 3.0 and changing financing behavior in the U.S. to be critical to Enphase's performance. With respect to the NEM 3.0 transition, Defendants' and investors' continued focus on the topic demonstrates its importance. As to financing behavior, Kothandaraman's decision to affirmatively raise the adverse analyst reports just to refute them shows this issue was critical to Enphase. These core operations allegations do not stand alone and must be viewed in the context of Defendants' monitoring statements and admissions. *See* Sec. IV.A. & C. Holistically, these allegations support a strong inference of scienter. *See In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1113 (N.D. Cal. 2013).

Additionally, because Enphase products were typically sold through installers, Defendants repeatedly touted maintaining close contact with its installer network. In July 2022, CEO said Enphase "[met] with 10 to 15 installers every week" to discuss any installer issues and what Enphase could do "to make sure their life becomes easier." ¶98. During the Class Period, to buttress his misleading reassurance that Enphase's installer base was "very diverse" with "both small and large installers that offer cash, loans, and PPA [lease] options to homeowners," Enphase's CEO noted "[w]e work with thousands of installers every quarter." ¶86. These allegations show that he had "actual access" to the disputed information and thus are sufficient to "independently" give rise to a strong inference of scienter, even without the additional bases for scienter set forth in Sections IV.A, C & E. *See S. Ferry*, 542 F.3d at 786.

**C.    Defendants' Monitoring Statements Support An Inference of Scienter**

From December 2021 and into the lead up to the Class Period, Defendants told investors they were closely monitoring California's NEM 3.0 decision, including the timing of any pull forward on demand. ¶¶49-55, 57-58. Starting in October 2022, Defendants also told investors they were monitoring the

potential impact of higher financing costs on Enphase's installers. ¶¶66-67.[7] These statements support a strong inference that Defendants were aware of the pull forward on demand in California and a lack of financing diversity amongst Enphase's installer base by the start of the Class Period (February 7, 2023). *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 939-40 (9th Cir. 2023) (strong inference of scienter where CEO "publicly stated that he carefully monitored NVIDIA's sales data" and "showed himself to be familiar with specific revenue numbers attributable to particular categories of sales"); *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at *5 (N.D. Cal. Jan. 6, 2025) (strong inference of scienter where defendants' comments suggested they "were monitoring capital expenditure numbers").[8]

### D.    Temporal Proximity Of Misstatements To Corrective Disclosure Supports Scienter

"[T]he law is clear that close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter, even if it cannot independently establish such an inference." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020). The misleading statements were made on February 7, 2023 and the truth was revealed and concealed risks materialized on April 25, 2023, just one quarter later, bolstering the inference of scienter.

### E.    Absence Of Financial Motive Allegations Does Not Undermine Scienter

Defendants point to a lack of insider stock sales to claim there was no scienter. MTD 12. But it is well-settled that the absence of insider stock sales does not negate an otherwise strong inference of scienter. *See, e.g.*, *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) ("absence of allegations of relevant stock sales" did not undermine inference of scienter where complaint did not allege financial motive or reference stock sales). In fact, the Supreme Court has clearly decided that "[t]he absence of a motive allegation  is not fatal." *Tellabs*, 551 U.S. at 325.

---

[7] While Defendants sold directly to only certain installers, they touted maintaining close contact with Enphase's installer base and were self-proclaimed "hawks" at monitoring Enphase's channel and inventory, *i.e.*, demand. *See, e.g.*, ¶98 (meeting with "10 to 15 installers every week"); ¶86 (working with "thousands of installers every quarter").

[8] *See also In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19-20 (W.D. Wash. Apr. 19, 2019) ("scienter can be inferred where a corporate officer states that he or she … was monitoring the subject of the misleading statements"); *S. Ferry*, 542 F.3d at 785 ("specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements" support an inference of scienter).

In sum, Plaintiff alleged a strong inference that Defendants recklessly or intentionally misled investors that Enphase (i) had a diverse installer base to protect it from a shift from loans to leases due to high prevailing interest rates, and (ii) had not already experienced a pull forward in demand by February 7, 2023 following the adoption of California's NEM 3.0.

## V.    THE COMPLAINT ALLEGES LOSS CAUSATION

A plaintiff may plead loss causation in "an infinite variety of ways," *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), including by alleging "that the defendant revealed the truth through 'corrective disclosures' which caused the company's stock price to drop," *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016), or "materialization of the risk," *i.e.*, that a "loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). The standard for pleading loss causation is "not … burdensome." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Defendants' disclosures during the 1Q23 earnings call on April 25, 2023 constituted partial corrective disclosures.[9] First, with respect to the installer financing statement, Defendants admitted Enphase's long-tail installers were not "ramped up" to provide leasing options, that new financing "innovation" was required to address the high interest rate environment, and that demand would be constrained until interest rates returned to normal. ¶¶73-74. These facts revealed the falsity of Defendants' prior representations that Enphase's "very diverse" installer base provided all forms of financing, such that any shift in the form of financing due to interest rates would have an "almost negligible" effect. ¶¶73, 86. Analysts confirmed that these challenges would continue to weigh down Enphase due to "its ***dominant market share to loan-heavy contractors***." ¶81.

---

[9] A disclosure is corrective if it "reveal[s], ***in whole or in part***, the truth concealed by the defendant's misstatements." *In re BofI*, 977 F.3d at 791. "[T]o be corrective, a disclosure ***need not precisely mirror*** the earlier misrepresentation." *Id.* at 790. "It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Id.*

Second, with respect to the pull forward statement, Defendants admitted that sell-through of both microinverters and batteries in California was materially lower in 1Q23 than in 4Q22, and that Enphase expected the difficult conditions in California with respect to battery sales to continue for the next 3 to 4 months. ¶70. This occurred despite an admitted "NEM 2.0 rush" that occurred within 1Q23. *Id.* According to analysts, these results were substantially weaker than expected. ¶¶78-79.

Defendants argue that these disclosures were not corrective because Enphase met its 1Q23 guidance and the weak guidance for 2Q23 related to future performance, "not correcting any past statement." MTD 15. But weak guidance for future periods can constitute a corrective disclosure, so long as the reason for that weak guidance is traceable to Defendants' misrepresentations. *See, e.g.*, *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 997-98 (D. Ariz. 2015) (denying summary judgment on loss causation with respect to reduced guidance for 2011 and issuance of initial weak guidance for 2012, because expert credibly connected weak guidance to issues that defendants misrepresented and the guidance "revealed the [company's] true financial condition"), *aff'd*, 881 F.3d 750 (9th Cir. 2018); *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 903 (S.D. Cal. 2019) (crediting expert opinion that defendant's "lowered earnings guidance … was part of the corrective information").

Alternatively, the Court may sustain the partial corrective disclosures as materializations of concealed risks. *See, e.g.*, *Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *10 (N.D. Cal. Feb. 24, 2025) (loss causation adequately pled by alleging defendant "downplayed the level of risk" and the concealed risks materialized). Here, Defendants downplayed the level of risk by claiming that its "very diverse" base of installers offered all financing options, when the majority of its installers were long-tail installers who did not offer leases. Defendants also downplayed the level of risk by denying that the NEM pull through had already occurred, when Enphase had already experienced weak sales following the initial rush. Both sets of concealed risks materialized, prompting a precipitous decline in Enphase's stock price. ¶¶13, 76.

## VI.   CONCLUSION

Defendants' motion should be denied. If the Court grants any portion of the motion, Plaintiff requests leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).[10]

---

[10] Plaintiff has adequately alleged primary violations under § 10(b). Plaintiff has thus rebutted Defendants' only challenge to control person liability under § 20(a). Control person liability is alleged.

DATED:  August 15, 2025

GLANCY PRONGAY & MURRAY LLP


By:    /s/ Charles H. Linehan
Charles Linehan
Melissa Wright
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  clinehan@glancylaw.com

*Attorneys for Lead Plaintiff Lon D. Praytor*
*and Lead Counsel for the Putative Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Plaintiff Lon D. Praytor*

## **CERTIFICATE OF SERVICE**

I, Charles H. Linehan, hereby certify that on August 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/ Charles H. Linehan*
Charles H. Linehan